## GRAND TRUNK RY. CO. v. TENNANT.

### (Circuit Court of Appeals, First Circuit. February 1, 1895.)

### No. 90.

**1. FEDERAL COURTS—JURISDICTION—ALLEGATION OF CITIZENSHIP.**

The pleadings in an action brought in the circuit court described the defendant as the G. T. R. Co. of Canada, and alleged that it was a corporation. *Held* that, in the absence of a specific objection in the circuit court that the defendant was not alleged to be a corporation created by any particular state or country, these allegations were sufficient to give jurisdiction.

**2. NEGLIGENCE—QUESTION FOR JURY.**

In an action for personal injuries to a brakeman in the employ of defendant railroad company, it was claimed that such injuries were caused in part by the improper construction of the car on which such brakeman was riding when the accident happened. The only evidence was such as described the construction of the car, neither party having offered evidence to show that it was either usual and safe, or unusual and dangerous. The defendant requested the court to charge that there was no evidence to show that the construction of the car caused or contributed to the injury. *Held* that, as the inferences to be drawn from the description of the car were exclusively for the jury, such instruction was properly refused.

**3. RAILROADS—DUTIES AS TO CARE OF TRACK.**

It was also claimed that the accident was the result of the defendant's failure properly to clear ice and snow from the track where the accident happened, which was a private track, extending onto a wharf, and as to which there was evidence tending to show that it was not under the care or control of the defendant. The court charged the jury that, when the defendant undertook to do business on the wharf, it took the responsibility of the track. *Held*, that a railroad train hand, whose duties do not require him to ascertain the limits of the corporation's road, has a right to assume that every track upon which he is ordinarily sent, physically connected with the corporation's line, is a part of its system, and that he is entitled, while upon it, to the usual protection; and hence, in the absence of a request that the jury should find whether the brakeman knew the facts as to ownership of the track, the instruction given was proper.

In Error to the Circuit Court of the United States for the District of Maine.

This was an action by Mary E. Tennant, as administratrix of John S. Tennant, deceased, against the Grand Trunk Railway Company, to recover damages for a personal injury. In the circuit court plaintiff recovered judgment. Defendant brings error. Affirmed.

Almon A. Strout (C. A. Hight and H. N. Rice, on the brief), for plaintiff in error.

Orville D. Baker, for defendant in error.

Before COLT and PUTNAM, Circuit Judges, and NELSON, District Judge.

¹ Rehearing pending.

PUTNAM, Circuit Judge. After the jury had been instructed, and while they were out considering their verdict, the plaintiff below, by leave of the court, amended the writ by describing herself as a citizen of the state of Maine, and the defendant below as a citizen of the dominion of Canada. That the court had power to allow this amendment, that it speaks as of the date of the writ, and that it was seasonable, involve too familiar rules to need comment by us. Since Insurance Co. v. French, 18 How. 404, it is settled law that, for jurisdictional purposes, it is not sufficient to allege with reference to a domestic corporation, party plaintiff or defendant, merely that it is a citizen of the state named. There must be an averment that it was created by the laws of that state, or to that effect. It seems to be accepted in Steamship Co. v. Tugman, 106 U. S. 118, 121, 1 Sup. Ct. 58, that the substance of this rule applies to a foreign corporation, party plaintiff or defendant. Even with the aid of the amendment, it is not specifically alleged that the corporation, defendant below, is or was an alien corporation, in that it was created by an alien state, or to that effect. But in the pleadings—indeed, in the very objection filed by it to the amendment, which objection is made a part of the record—the defendant below is described as the "Grand Trunk Railway Company of Canada." That the mere fact of the incorporation in its title of the name of a certain state does not necessarily constitute or supply the allegation required was settled in Piquignot v. Railroad Co., 16 How. 104. But less appeared in that case than in the case at bar. Here it was expressly stated in the declaration that the defendant below is a corporation; and, in the absence of any objection taken by it in the court below, it may be presumed that the words "of Canada" describe the country of its creation. In the absence of any objection made in the court below on this particular proposition, the record may fairly be construed against the defendant below; and, as the words "of Canada" are fairly susceptible of the construction claimed by plaintiff below, we give them that construction, and hold that the record, as it stands, alleges the proper jurisdictional facts. There is sufficient doubt not to have required the court to notice the matter of its own motion. King v. Asylum, 12 C. C. A. 145, 64 Fed. 331, 332.

We find no error in the overruling of the request of the defendant below for the direction of a verdict in its favor on the whole evidence in the case. Even if the case had stood in its favor with reference to all those parts of it relating to the car in question, which we will refer to again, it was yet a proper one for the jury, under suitable instructions. Even if none of the circumstances were in dispute, the inferences to be drawn from them were fairly so, and the case as a whole comes within Railway Co. v. Ives, 144 U. S. 408, 12 Sup. Ct. 679, and Railroad Co. v. Powers, 149 U. S. 43, 45, 13 Sup. Ct. 748, affirmed in Railroad Co. v. Everett, 152 U. S. 107, 113, 14 Sup. Ct. 474.

With reference to the specific exceptions, we remark, at the outset, that for the most part the principles of law involved are

familiar ones, and the sole duty of the court was to apply them to a class of facts easily apprehended by juries. Therefore, to make any remarks touching the various questions discussed, except to state generally that the court below correctly and carefully instructed the jury on the main case, would be but a useless repetition of common learning. Out of the mass of cases we will refer to three only, which bear directly on the propositions specially urged on us, touching the alleged want of care on the part of the employé, and the risk claimed to have been assumed by him: Kane v. Railway Co., 128 U. S. 91, 94, 9 Sup. Ct. 16; Railroad Co. v. Everett, 152 U. S. 107, 112, 14 Sup. Ct. 474; Railroad Co. v. Babcock, 154 U. S. 190, 200, 14 Sup. Ct. 978. There are, however, two points requiring our particular consideration.

The person for whose injuries the suit was brought was a brakeman in the employ of the defendant below. He was at work, in the usual course of his employment, at the rear end of a few freight cars backing down, in the nighttime, in the winter season, upon what was known as "Brown's Wharf," in Portland, for the purpose of coupling to a freight car on the wharf, and drawing it out. He rode down the wharf on the end of the car which was to be shackled to the car previously on the wharf, and, when near the latter, stepped or jumped to the side of the track, under such circumstances that the jury might have found that it was for the purpose of signaling the engineer. An accumulation of snow or ice alongside the track caused him to slip under the wheels of the car, and there he was fatally injured. The plaintiff below claimed that the car was insufficiently and negligently constructed with reference to the steps, handles, or guards at its end, and that if it had been sufficiently and properly constructed and equipped in this respect, the deceased could have retained his hold, and that in this way the alleged peculiar construction of the car contributed to the result. It was claimed by the defendant below that the car was a foreign car temporarily on its road, and the court below apparently assumed, and it did so correctly, that there was evidence to go to the jury on this proposition. There was no claim that the car was out of repair, and the objection to it related to it in its normal condition; and the jury might have been allowed to find that its peculiarities were patent to the slightest inspection or observation by any one accustomed to handling freight cars.

The essential allegations of the declaration touching these alleged defects were as follows:

"And the plaintiff further avers that on said 24th day of January, 1891, said defendant corporation, wholly disregarding its duty in the several respects aforesaid, wrongfully and negligently provided unsuitable and unsafe tracks along said Commercial street, and upon and over said wharf, and negligently allowed said tracks, and the sides and wharf adjoining the same, where the duties of the plaintiff required him to step, alight, and stand, and for a considerable distance therefrom, to become incumbered, obstructed, sloping, and dangerous by improper accumulations of snow, sleet, and ice, and provided unsuitable and unsafe cars for use upon said track, and neglected to equip the same with steps, ladders, handles, guards, and other appliances necessary to render the same safe, suitable, and adapted for their purpose, and in these and other respects negligently exposed the plaintiff to unusual peril in performance of his duties."

The only rulings of the court touching the car, which, under the general remarks we have already made, we need notice, were raised by, or are suggested in, the following requests for rulings, made by the defendant below:

"That if the jury find that the construction of the car, as to the step and handle or rail, was defective, still, the plaintiff's intestate, Tennant, having taken hold of this rail, and standing upon this step of his own will, and having the opportunity to see what the construction was, he cannot recover, even if his injury was caused either in whole or in part by such construction.

"That there is no testimony in this case to show that the construction of the car complained of caused or contributed to his injury, and therefore he cannot recover for any such injury."

The court below gave full and correct instructions touching the subject-matter of the first of these requests; and, as they involve only familiar rules of law, we need not comment on them, as we have already said. With reference to the latter of these requests, neither party has called our attention to any evidence in the record, except that describing the construction of the car. The defendant below put in no proof that it was of usual or safe construction, and neither party offered any evidence to show what opportunities the defendant corporation had, with reference to protecting its employés against its peculiarities, if there were any, and none tending to show whether the intestate had reason to anticipate the use of such cars in the course of his employment, as was the fact in Kohn v. McNulta, 147 U. S. 238, 13 Sup. Ct. 298. Both parties were content to let the case go to the jury upon such inferences as they might draw from the mere description of the car. Such inferences are exclusively for the jury, and are not within the range of those which the court can draw. In the absence of any specific proof, the question of the proper construction of this car was exclusively for men of practical experience, and therefore one of fact, which the court has no method of reviewing. It is true the court instructed the jury that it was immaterial, for this case, whether or not the car was received from some connecting line. We are not called on to pass on that proposition, because it was not specifically excepted to, nor was it within the scope of the requests which we have cited. If excepted to at all, it was as a part of extracts from the charge, containing much matter, and excepted to as a whole. It is a wholesome rule, just to the court below, and essential to prevent unnecessary new trials and the consequent expense and delay, that usually no error can be assigned as such unless the record shows that it was specifically brought to the attention of the court below, in such way that it was seasonably enabled to correct inadvertences.

The requested instructions, touching the relations of the defendant corporation to Brown's wharf, were as follows:

"That if the jury find that Brown's wharf, at the place of the injury, was at the time of the accident, on the morning of the 24th of January, 1891, the property of, and under the control of, the proprietors of the wharf, and that the shoveling of the snow at the place of the accident was not done by, and was not under the control of, the defendant railroad, that the defendant railroad would not be liable for the condition of the snow and ice at the side of the track where the accident happened, notwithstanding that it used the

wharf occasionally for delivering cars consigned to the tenants or proprietors of the wharf, and had occasionally, prior to the accident, temporarily run their cars onto the wharf in making up their trains, in violation of the orders of the proprietors of the wharf, and that upon this ground the plaintiff cannot recover.

"That such use would not give the defendant railroad any right to enter upon and control the wharf, nor would it impose upon the defendant railroad any duty or obligation to shovel snow or remove the same, or render it liable for not so doing.

"That if the act of making up trains on any part of the wharf was without the knowledge and direction of the defendant railroad, and contrary to the instructions given the trainmen, the defendant railroad did not take upon itself any liability by such unauthorized acts so far as the plaintiff's intestate is concerned, he being one of the trainmen doing those unauthorized acts.

"That if the plaintiff's intestate knew, or in the ordinary performance of his work might have known, that the defendant company did not shovel the wharf and tracks in winter, the condition of the wharf and tracks was a risk assumed by the plaintiff's intestate, and there can be no recovery."

The last of these requests must be understood to relate to the condition of the tracks without reference to the question of proprietorship, which we will consider further on. Suitable instructions were given by the court below touching what the jury might find the intestate did or did not assume, and touching the effect of his knowledge of the usual state of affairs on the question of his alleged contributory negligence. Whatever was suggested by either of the four requests was properly given, unless it appears otherwise from the following extract from the charge, and the exception to it:

"Now, I have to instruct you, as a matter of law, that when the Grand Trunk Railway Company undertook to do business down upon that wharf, and sent its train and trainmen down there in the transaction of business pertaining to their road, they, for the several occasions on which they so sent the men down there, took the responsibility of that track, whether they owned it or not. Under their relations to the track as shown here, they were not liable for its continuance and constant condition. They were not under obligation, as they were to other portions of their own track, to keep it always in order for sending their men down there; but they were, as to their workmen, under responsibility to have it reasonably and suitably safe for the occasion, when the men were ordered to go there, and did go there."

This was in effect but one proposition, and was properly excepted to as such. All it left to the jury was the determination of the questions whether the defendant corporation undertook to do business on the wharf, and whether it sent its trains and trainmen on the wharf for the transaction of business pertaining to its road. If the jury could pass over these limitations, it was bound by these instructions to regard the track on Brown's wharf, for the purposes of the case, as it would any track constructed, owned, kept in repair, and exclusively operated by the defendant corporation.

The evidence to which we are referred, bearing on this question, was as follows:

Mr. Douglas, who was the agent of the owner of the wharf, testified as follows:

"Q. Now, will you state what tenants, if any, you have on the wharf, and where they are situated at the time of the accident in January, 1891? A. J. H. Hamlin & Son occupied a portion of the wharf on the east side, and also the brick mill on the west side. E. W. Deering & Company occupied

the coal shed. The other tenants were paying wharfage in small pieces; no fixed tenants. Q. I will ask you if you remember the accident. A. I do. Q. Now, whether or not there were one or two tracks down the wharf from Commercial street. A. There were tracks, two lines of tracks. Q. To whom did they belong? A. To the Brown estate. Q. And under whose control were they? A. The Brown estate. Q. Whether or not you had charge of them as the agent of that estate. A. I had. Q. Now, under whose control and direction were the repairs and the maintenance of the wharf and tracks in January, 1891? A. Under my charge. Q. State, if you will, who, from time to time, shoveled out those tracks. A. Men in our employ shoveled them. Q. As to the snow on the rest of the wharf, if anything was done with it during the winter of 1891, under whose control and direction was it done? A. Nothing was done. Q. Except shoveling out the tracks? A. Yes, sir. Q. What railroads, from time to time, came down on Brown's wharf with cars, if any? A. The Boston & Maine road and the Grand Trunk road. Q. For what purpose, in 1891, did they go down the wharf and over that track, in connection with your tenants? A. For the purpose of delivering cars at the warehouses occupied by J. H. Hamlin, for no other tenant received cars at that time but J. H. Hamlin & Son. Q. Was there any other purpose for which they came down there, except for the purpose of delivering cars consigned to J. H. Hamlin & Son, and taking away cars that had been unloaded or loaded that you know of? A. Not to my knowledge."

Mr. Mason, a section foreman for the defendant corporation, testified as follows:

"Q. What are the limits of your section? A. Twenty-eight miles. Q. Where are the boundaries? A. I go from Union wharf to a mile west of Back Cove bridge, towards Gorham. I mean I have twenty-eight miles of track. Q. What are the duties of a section foreman? A. It is to keep the track in repair, in running order for trains. Q. What are a section foreman's duties in the winter? A. It is to keep their track in order, and to keep their track shined up; to keep all snow clear from the track as far as they can. Q. Who has charge at the end section of the Grand Trunk at this end of the road,—that is, the section farthest east? A. You mean in the yard limits? Q. Yes. A. I do. Q. Isn't that the most easterly section of the road, as we call it? A. We go to the heel of Union wharf switch on Commercial street. Q. Is there any one but yourself who has charge of shoveling snow on this easterly section in the winter time? A. No, sir. Q. How long have you been in the employ of the Grand Trunk in this position? A. In this yard, eight years the 18th day of last May, as section foreman. Q. State what, if anything, you have had to do with repairing and maintaining the tracks on Brown's wharf during that time. A. I never had anything to do with it. Q. State whether or not your men had anything to do with it during that time. A. No, sir. Q. State whether or not you, or men under your direction, have had anything to do with shoveling snow on the wharf during that time. A. They never have. Q. Where is Brown's wharf with reference to Union wharf? A. I could not tell where Brown's wharf is. Q. Do you know whether it is above or below Union wharf? A. It is above Union wharf, towards the Boston & Maine. Q. Is it on Commercial street, on the part that the Boston & Maine have under their control? A. Yes, sir; that is where it is."

Mr. Stewart, yard master for the defendant corporation for 31 years, testified as follows:

"Q. During the time that you have been in the employ of the Grand Trunk, has the Grand Trunk done anything in the way of making any repairs on that track or shoveling snow on the wharf within the rails or outside the rails? A. No, sir; not the Grand Trunk bearing the expense of doing it. Q. Have they ever had anything to do with keeping in repair the tracks or shoveling snow at their own expense? A. Not at their own expense. Q. You say they have never had anything to do with maintaining and keeping in repair the tracks at their own expense? A. Yes, sir. Q. Now, state, if you know, whether they have had anything to do with anything upon that wharf, repairing the

tracks in any way there, at their own expense or at the expense of some one else. A. I will tell you what I mean. The wharf company have applied to the general engineer of the Grand Trunk for labor, for section men to put the track in :order, and which they paid for,—hired them to do it. Q. That is, the Grand Trunk men were workmen skilled in this kind of work? A. Section foreman and track clearers. Q. State exactly what you mean by the Grand Trunk employés having ever had anything to do with the tracks. A. I mean, if the track was out of repair, rails or ties, they wanted to get a suitable man to repair it, and they would apply either to us or the Boston & Maine for special help,—section foreman and crew,—to put the track in good repair, not having any one as a rule to work for themselves; and they paid for it, and had to go through a certain form to do it,—apply to the general engineer. Q. Did anything of that kind ever happen in relation to shoveling snow? A. No, sir; just simply repairing the track. Q. State what, if anything, the Grand Trunk had to do with those tracks in the year of 1891, or in the latter part of the year 1890, in that winter, either as to repairing or removing snow. A. I don't know whether they did any repairing; shoveled no snow from the track. Q. Do you know of any repairing that year? A. Not aware of any repairing being done. Q. State exactly what use the Grand Trunk Railway Company, or the employés of the Grand Trunk Railway Company, made of that wharf in 1890 and 1891. A. Placed cars on there ordered by the consignees; placed and took away,—took away the empties. Q. Let me ask you if any extra charge was paid by the consignees for putting the cars down on that wharf. A. Yes, sir. Q. What was the charge? A. One dollar per car. Q. What was this payment for, just exactly? A. The extra work of putting the cars up from the street on the wharf? Q. Were you paid for stopping cars on the street? A. No. Q. The same price for putting them on as for taking them off? A. No; only for putting them down. The dollar actually covered putting them down, and taking them back again. Q. Prior to this accident, whether you received any notice from the proprietors of the wharf in relation to the use of it. A. Yes, we did. Q. Whether or not that notice was in writing. A. It was not. Q. To whom was the notice given? A. It was given to me by the agent of the wharf company, the agent of the Brown estate, Mr. Douglas. Q. State as near as you can when you received the notice. A. I cannot give the exact dates; a few years before that accident. Q. You may state what the notice was that you received from the proprietors of the wharf as to the use of it. A. We were requested not to put cars on that wharf other than those that belonged there to the consignees, for the reason that it obstructed the premises occupied by the tenants, and also stated to me that it wore the rails out, the constant use of the track. Q. After receiving that notice, state whether or not you did put cars there, or was it for any other purpose than for the tenants of the wharf? A. Not to my knowledge. Q. Who is in charge of the employés who work upon the street of the Grand Trunk Railway Company? A. I am."

This testimony was proper to go to the jury on the propositions that the proprietors of the wharf not only remained in control of the track, but exercised that control; that the defendant corporation, as such, never repaired the track, nor cleared the snow; that the wharf was not even adjacent to that part of the track on Commercial street kept in repair by it; that it was adjacent to the part kept in repair by the Boston & Maine Railroad; that the track on the wharf was also used by the Boston & Maine Railroad; that its use at the time of the accident, and for some time before, was for limited, private purposes; that it formed no part of a public railroad highway, and no part of the yards of the defendant corporation; and that it was, in fact, a mere private siding, such as are frequently used and well known in connection with wharves, lumber yards, and mills. In short, it was proper evidence for the jury on the proposition that this track was of the kind found to

exist as a private mill-yard track in Engel v. Railroad Co., 160 Mass. 260, 35 N. E. 547; and that, as said by the court in that case on page 261, 160 Mass., and page 547, 35 N. E., the defendant corporation "came on that track only as licensee, or invited under a contract by which it delivered freight in the mill yard on certain terms."

This evidence would raise important questions of law, and cause us to seriously question the ruling excepted to, if there had been any request that the jury should find whether the intestate knew, or should be presumed to have known, the essential facts which this evidence may be said to tend to prove. Whatever might be the rule under other circumstances, we must hold that a railroad train hand, employed in a branch of the service, as the intestate was, where no duties fall on him which contain a call to ascertain the limits of the corporation's road, has a right to assume that any track upon which he is ordinarily sent in the performance of his duty, physically connected with the corporation's main line, is a part of its system, and that he is entitled to the usual care and protection of the corporation while running over it. Where a railroad corporation has running rights over a section of the main line of another, there would ordinarily be no difficulty on this score, as the fact is commonly made known to trainmen by the printed rules and regulations given them for their direction, and in other ways. But, for a siding like this at bar, the presumption on the question of the trainman's knowledge is fairly against the corporation, and it is its duty to meet this presumption if it seeks to raise a defense of the character we are discussing. A railroad corporation ought not to be allowed ordinarily to send its trainmen upon private sidings or tracks, for daily work, without making proper efforts in some way to provide for their safety. The dangerous nature of their employment, and the necessity of their prompt, and sometimes unquestioning, obedience to orders, do not ordinarily justify the court in relaxing the care which railroad managers must extend to them, wherever they may send them for their usual work. Very likely an exception would lie in the case of running rights under the circumstances we have described, and also in cases of private sidings where the essential facts are known to the persons employed. But, as this exception rests on the same foundation as the principle of the assumption of risk by an employé, the party setting it up must furnish sufficient evidence to overcome the opposing presumption, and also the equities based on the general duties of persons and corporations carrying on the hazardous business of operating a railroad. Such evidence, in order to constitute a preponderance of the case, must, ordinarily, be clear and persuasive. The defendant in error says there was none, and the plaintiff in error has not called our attention to any of a specific character, though what we will quote hereafter is relied on. But the essential difficulty with the case of plaintiff in error on this record is that the requested instructions which we have quoted make no mention of this element, and leave it to be inferred that in the court below the defendant corporation did not regard it as

a necessary one, and so omitted to call the attention of the court to it.

The plaintiff in error relies on the following from the testimony of Kingsbury, a fellow workman of the intestate:

"Q. You were a friend of Mr. Tennant, weren't you, and very warm personal friend of his? A. No personal, any more than being there in the house with them. Q. You were on friendly terms, weren't you? A. Yes, sir. Q. How long had he been in that business? A. About ten years, I think. Q. And during that time, had he been in this, what is called the street, service,—that is, distributing cars from the trains? A. I don't know, but I think he had pretty nearly all the time. Q. And whether or not, to your knowledge, he was thoroughly acquainted with Brown's wharf, the location there? A. I think he was. Q. Coming down to the night of the accident, do you know whether there had been a storm in the early part of the week,—a snowstorm? A. I don't remember; no, sir. Q. Can't you tell? A. There had been a storm some time before that, but how long it was I could not say. Q. It had been shoveled out, hadn't it? A. It had. Q. By no one connected with the Grand Trunk that you know of? A. Not that I know of. Q. It was Mr. Brown's men that shoveled it out, wasn't it, as a matter of fact? A. I don't know who shoveled it out."

This raises an inference that, by reason of his long continuance in the service of the corporation, the intestate might have known the essential facts touching the track on this wharf; but in view of what we have already referred to, that the intestate's occupation covered no call to inform himself in that respect, and further, in view of the fact that nothing in the case raises any presumption to charge him with notice, this possible inference falls far short of that degree or amount of proof needed to enable us to determine that the court below would have erred, even if it had wholly omitted to submit to the jury the matter under consideration, in the absence of a requested instruction, correctly and specifically framed, with reference to this element of the intestate's knowledge or presumed knowledge. We have already shown that the instructions requested were not so framed. Consequently, the error, if there was one, in giving the jury a rule on this point too rigid, was, as the record stands, immaterial. We will add that there is no evidence brought to our attention that Stewart communicated to the intestate the notice which his testimony quoted shows was given by the owners of the wharf in relation to the use of the tracks on it.

The exceptions taken in the course of the examination of the witnesses have been brought to our attention with reference to only two points. The question put to Stewart, and excluded, clearly belonged to the case in chief of the plaintiff in error, and therefore to the direct examination of that witness; and it was within the discretion of the trial judge to refuse it. The testimony of Norton objected to is not of itself very intelligible, nor has it been made so by counsel, and whether it could have prejudiced plaintiff in error in any way is not made clear to us. The grounds of objection stated would have applied quite as well if the witness had offered details of mathematical measurements, and they are therefore plainly insufficient. Whether he should have been allowed to testify in the clumsy manner in which he undertook to answer, or

whether he should have responded more precisely and in direct reply to the question, seems to have been left by counsel on both sides to his own determination.

On the whole, we see no error in the record. The judgment of the circuit court is affirmed.