MATHIESON ALKALI WORKS v. MATHIESON.

(Circuit Court of Appeals, Fourth Circuit. November 19, 1906.)

No. 594.

**1. CORPORATIONS—ACTIONS—PLEADING—CORPORATE EXISTENCE.**

An allegation that defendant was a corporation under the laws of the state of Virginia, and a citizen of Virginia, and a resident of the Western District of that state, was equivalent to an allegation that defendant was created by, or organized under, or existing under, the Virginia laws.

[Ed. Note.—For cases in point, see Cent. Dig. vol. 12, Corporations, § 2053.]

**2. SAME.**

Where, in an action on a contract against a corporation, the contract was set out verbatim as a part of the declaration, and the contract recited that the party of the first part (the corporation defendant) was a corporation existing under the laws of the state of Virginia, with headquarters located at S., in that state, such allegation sufficiently averred that defendant was organized under the laws of the state of Virginia.

[Ed. Note.—For cases in point, see Cent. Dig. vol. 12, Corporations, § 2053.]

**3. PLEADING—DECLARATION—AMENDMENT TO CONFORM TO PROOF.**

Plaintiff's declaration in an action against a corporation on a contract purported to set out the contract verbatim, and recited that it was signed by defendant's president and attested by its secretary and corporate seal; but, in copying the contract, there was nothing in the declaration to represent the seal. When the contract was introduced in evidence, it appeared that the corporate seal had been attached as recited in the contract, whereupon plaintiff was granted leave to amend the declaration to conform to the facts. *Held,* that such amendment was properly allowed in the furtherance of justice, as authorized by Code Va. 1887, § 3384, and by Rev. St. § 954 [U. S. Comp. St. 1901, p. 696].

[Ed. Note.—For cases in point, see Cent. Dig. vol. 39, Pleading, §§ 607, 613.]

**4. WITNESSES—CONTRADICTION—IMMATERIAL QUESTION—CROSS-EXAMINATION.**

Where a contract of employment provided that after the expiration of three years plaintiff should not be required to spend any more time in America than he might elect to spend, but should give such attention to the business as might be necessary to promote defendant's best interests, and plaintiff testified that he had no reason for not returning to the United States after the expiration of the three years, except that he was not wanted, questions asking if his reason for leaving and not returning was not that J. was appointed general superintendent of the plaintiff in the United States were properly excluded as an attempt to contradict the witness on an immaterial point.

[Ed. Note.—For cases in point, see Cent. Dig. vol. 50, Witnesses, § 1273.]

**5. CONTRACTS—BREACH—EVIDENCE—COLLATERAL QUESTIONS.**

Where, in an action for services under a contract for the establishment of an alkali plant, it was contended that plaintiff established a plant of an obsolete character, and the court permitted a witness to testify fully concerning the character of the plant and to give his opinion as to its insufficiency, evidence as to the reason for the noncompletion of negotiations between the company represented by a witness and defendant's company for the consolidation of their work was properly excluded as involving a collateral issue.

**6. WRIT OF ERROR—RULINGS ON EVIDENCE—PREJUDICE.**

Where an expert was permitted to testify specifically with regard to defendant's compressors, and to state the objections he entertained to them

· 150 F.—16

as to material and design, and why they were, in his opinion, neither efficient nor suitable, and why they had been superseded in all well-designed similar plants, defendant was not prejudiced by the refusal of the court to permit the witness to answer as to whether the compressors in question were suitable for the purpose for which they were installed, etc.

[Ed. Note.—For cases in point, see Cent. Dig. vol. 3, Appeal and Error, §§ 4194–4199.]

7. WITNESSES—EXAMINATION—QUESTIONS.

On an issue as to the insufficiency of certain compressors, installed in defendant's plant by plaintiff, the question, asked of an expert, as to whether or not in 1885 he saw better compressors than those installed by plaintiff for defendant in use in England, was properly excluded as too general.

8. CONTRACTS—BREACH—PERFORMANCE—DEFECTS.

Where plaintiff, prior to his employment by defendant, was a resident of England, and did not hold himself out in a general sense as a mechanical expert, but merely as having experience in managing alkali works, and as knowing the proper requirements and construction thereof, and it also appeared that all defendant's plans and contracts for the construction of its works were based on the works at which plaintiff had been previously employed in England, plaintiff was not responsible because he installed English gas compressors in defendant's plant, when American compressors of equal efficiency and economy and equally well adapted for the purpose could have been purchased for much less money.

9. SAME.

Where, in an action for services of plaintiff under a contract for the construction of an alkali plant, defendant claimed that the plant constructed by plaintiff was obsolete and insufficient, plaintiff was entitled to prove that such plant was better than an English plant after which it was modeled, and that it was up to date in character, efficient, and as good as those of other concerns engaged in the same business.

10. TRIAL—REQUEST TO CHARGE—REFUSAL.

The trial judge is entitled to refuse to instruct the jury in the language proposed in a request to charge, and to present the case to the jury in his own language, provided the entire case is covered and the law correctly declared.

[Ed. Note.—For cases in point, see Cent. Dig. vol. 46, Trial, §§ 664–668.]

11. CONTRACTS—ACTION FOR SERVICES—INSTRUCTIONS.

In an action for services under contract for the installation of an alkali plant, an instruction that if plaintiff, solely because of ignorance, incompetence, or negligence, erected for defendant works of an antiquated style and plan, which were insufficient for the purpose intended, and placed therein engines, pumps, and other machinery which were antiquated and insufficient, and at an expense which was unreasonable and unnecessary, allowances might be made for damages resulting from such negligence or incompetency, but that the jury should consider whether an English plant was contemplated by both parties as a model, and whether such contemplated design was reasonably carried out, was proper.

12. SAME—PRESUMPTION OF SKILL.

In an action for services under a contract of employment, an instruction that, when plaintiff entered into the contract, the law implied an undertaking that he would use reasonable care and diligence, and would exercise reasonable skill and knowledge in the prosecution of his duties, but, in deciding such question, the jury should consider defendant's knowledge, at the time the contract was made, of plaintiff's previous experience and training, was proper.

Boyd, District Judge, dissenting.

In Error to the Circuit Court of the United States for the Western District of Virginia, at Abingdon.

George E. Penn (James L. White and F. W. Christian, on briefs), for plaintiff in error.

William W. MacFarland and Daniel Trigg, for defendant in error.

Before PRITCHARD, Circuit Judge, and MORRIS and BOYD, District Judges.

MORRIS, District Judge.   This was an action at law, instituted August 3, 1903, by T. T. Mathieson, stated in his declaration to be "an alien and subject to the kingdom of Great Britain, plaintiff," against, as stated in the declaration, "The Mathieson Alkali Works, a corporation under the laws of the state of Virginia, and a citizen of Virginia, and a resident of the Western district of Virginia, in which its principal office is situate, defendant."   The action was to recover a balance of salary alleged to be due to T. T. Mathieson, the plaintiff below, by the corporation, the Mathieson Alkali Works, under a contract in writing, dated August 15, 1893, and sealed with the corporate seal of the corporation, by which the corporation employed the said plaintiff as general superintendent for the term of eight years. The case was submitted to a jury, and, the verdict being in favor of the plaintiff, the defendant corporation, the Mathieson Alkali Works, by writ of error has brought the case here to test the correctness of the rulings of the trial judge upon questions of pleadings, of admissibility of testimony, and of instructions to the jury, which were excepted to during the trial.

The plaintiff in error now in this court for the first time raises the question of the sufficiency of the averments of the declaration to sustain the jurisdiction of the trial court, and it is urged that the averment that the Mathieson Alkali Works, "a corporation under the laws of the state of Virginia, and a citizen of Virginia, and a resident of the Western district of Virginia, in which its principal office is situate," is not equivalent to the phrase, "created by, or organized under, or existing under the laws of Virginia," and is insufficient.   We think that the phrase, "a corporation under the laws of the state of Virginia," is equivalent in legal intendment to the phrase, "existing under the laws of Virginia."   Grand Trunk Ry. Co. v. Tennant, 66 Fed. 922, 14 C. C. A. 190.   Furthermore, we think that, if a more specific jurisdictional averment was needed, it is supplied in another part of the declaration, in which the contract sued upon is inserted verbatim as a part of the declaration.   It is therein recited that the party of the first part is "the Mathieson Alkali Works, a corporation existing under the laws of the state of Virginia, with headquarters located at Saltville, in said state."   Chapman v. Barney, 129 U. S. 677, 9 Sup. Ct. 426, 32 L. Ed. 800, and Thomas v. Board of Trustees, 195 U. S. 207, 25 Sup. Ct. 24, 49 L. Ed. 160, relied on by the plaintiff in error, were cases in which there was no averment that the party was in fact a corporation at all.

It is assigned as error that after the jury had been sworn the plaintiff was allowed to amend his declaration by adding a count declaring on the contract as a sealed instrument, whereby the defendant was deprived of the benefit of his plea of the statute of limitations of five

years. In the plaintiff's declaration the contract is set out verbatim, and, although it plainly recites: "In witness whereof the said Mathieson Alkali Works has caused this agreement to be signed by its president and attested by its secretary, and its corporate seal attached hereto, and the said T. T. Mathieson has signed the same"—in copying this contract into the declaration nothing to represent a seal was indicated. When the contract was produced in evidence, and it was apparent that the corporate seal had been affixed, and that it was a sealed instrument, as recited in the contract itself, leave was granted the plaintiff to amend the declaration to make it conform to the fact. Such an amendment, if the court considers that substantial justice will be promoted by it, is authorized by section 3384 of the Virginia Code of 1887 [Va. Code 1904, p. 1792], and it is common practice. Mack v. Porter, 72 Fed. 236–243, 18 C. C. A. 527; Chapman v. Barney, 129 U. S. 677–681, 9 Sup. Ct. 426, 32 L. Ed. 800. It is authorized by section 954 of the Revised Statutes of the United States [U. S. Comp. St. 1901, p. 696]. There can be no question that the amendment was within the discretion of the trial judge and was properly allowed.

The contract being under seal, the statute of limitations applicable under the laws of Virginia was ten years, and the court was right in rejecting the plea of five years. The contract was as follows:

"These articles of agreement made and entered into by and between the Mathieson Alkali Works, a corporation existing under the laws of the state of Virginia, with headquarters located at Saltville, in this state, party of the first part, and T. T. Mathieson, party of the second part, witnesseth as follows:

"(1) The said Mathieson Alkali Works have employed the said Mathieson as general superintendent for the term of eight years upon the terms and conditions hereinafter stated. That is to say, the said T. T. Mathieson is to give his time and attention for either two or three years, as he may elect, to the erection and general management of the works of the said company, and also to their operation after the same shall have been erected. It being understood and agreed during this term of either two or three years as the case may be, the said Mathieson is to remain and be present at such places in the United States as the business of the company may require, principally at Saltville, except that he is to have such vacation during this period as can be availed of without detriment or hindrance to the proper management of the business of the said company, and for this period of two or three years, as the case may be, he is to be paid at the rate of 3,000 pounds sterling per annum, payments therefor being made in monthly installments.

"(2) For the remainder of the unexpired term of eight years the said Mathieson is to be paid 1,500 pounds sterling per annum and during this unexpired portion of the period of eight years, it is understood that the said Mathieson shall not be required to spend any more time in America than he may elect to spend. The object and purpose, however, being that he shall give such attention to the business as may be necessary in order to promote its best interests.

"(3) The said Mathieson Alkali Works agree to pay the said Mathieson during the full period of eight years a commission at the rate of 5% per annum upon all net profits realized by the Mathieson Alkali Works over and above 60,000 pounds sterling per annum.

"(4) The above compensation is to give the said Mathieson Alkali Works the ownership for the United States an exclusive right to use any patents or any interest in any patents which the said Mathieson may now own or which he may hereafter perfect or acquire during the period of this contract.

"The Mathieson Alkali Works further agree that they will provide a suitable residence for the said T. T. Mathieson at the works at Saltville, Virginia, dur-

ing said period of eight years or such portion as the said T. T. Mathieson shall elect to reside at Saltville, Virginia.

"The Mathieson Alkali Works further agree that the said T. T. Mathieson has the option to purchase $100,000 worth of the company's stock at par, with interest at the rate of 5 per cent. per annum added, from the average date of payment of the subscribers to the stock of said Mathieson Alkali Works, at any time he may elect to do so during the period of the first three years of his employment, and the company agrees to reserve the said shares for the said T. T. Mathieson during the said period.

"The said Mathieson agrees that he will not enter into any similar business in the United States of America during the continuance of this agreement.

"The salary of the said T. T. Mathieson is hereby declared to begin from the 1st day of February, 1893.

"In witness whereof the said Mathieson Alkali Works has caused this agreement to be signed by its president and attested by its secretary and its corporate seal attached hereto, and the said T. T. Mathieson has signed the same.

"Executed in duplicate on this 15th day of August, 1893.

| "[Signed] | Mathieson Alkali Works, |
| | "By Edward E. Arnold, President. |
| "[Signed] | T. T. Mathieson. |

"[Corporate Seal Mathieson Alkali Works, 1892.]
   "Signed in presence of
      "J. F. Van Name.
      "J. H. Ingram.
   "[Signed]                                        M. P. Robertson, Sec'ty. [Seal.]"

The plaintiff's claim as submitted to the jury was for the unpaid £1,500 sterling per year from September 1, 1896, to February 1, 1901, a period of four years and six months, amounting to about $33,750, with interest. The plaintiff claimed that he had fully performed and carried out all the acts and things to be done by him according to the terms of the contract and that the defendant had failed to pay him in breach of the contract.

The defendant by its special pleas set forth that the contract of employment of the plaintiff was made in contemplation of the erection and management by the plaintiff of extensive works for the manufacture of soda ash, caustic soda, and other products at Saltville, Va., requiring peculiar skill and knowledge which the plaintiff had represented that he possessed, but that the plaintiff did not have nor exercise the knowledge, skill, and care required for the performance of the duties contemplated by the contract, but was careless, negligent, and unskillful, and constructed for the defendant works of an antiquated style, insufficient for the purposes intended, with antiquated and insufficient appliances, at an excessive and unreasonable cost, in consequence of which the defendant has been obliged to tear down and remodel its works, and discard the machinery placed there by the plaintiff, and substitute other machinery at great loss; that the plaintiff absented himself at times when his presence was specially needed, and did not give such attention to the business of defendant company as was necessary to promote its best interest, but conducted himself in a negligent and careless manner, and left the United States during the year 1896, and did not return. The defendant further claimed by way of recoupment that by reason of the want of skill and neglect of the plaintiff in the performance of his contract the defendant had sustained damages amounting to $150,000, which was

owing by the plaintiff to defendant, and which the defendant was willing to set off against the plaintiff's claim.

At the trial the evidence showed that the defendant company was promoted by Mr. Edward E. Arnold, of Providence, R. I., who had for many years been selling agents in the United States of the products of the alkali works of N. Mathieson & Company at Widnes, in England. Mr. N. Mathieson, the father of the plaintiff, was the managing partner conducting those works, which were successful and of high repute. The plaintiff had been general manager of those works for 15 years, and in 1892, when the negotiations began which led to his signing the contract in suit, he was profitably employed with another manufacturer of chemicals in England. Mr. Arnold visited and inspected the works at Widnes, and he knew that the Widnes plant was the one that the plaintiff was familiar with and accustomed to. Mr. Arnold had the most optimistic estimate of the advantages of the location at Saltville as a site for the proposed works, and prevailed upon Mr. Neil Mathieson to come to the United States and visit it, and gave the new company Mr. Mathieson's name. There seems no room to doubt that it was the works at Widnes which were in the mind of all the parties as in a general way the pattern after which the new works at Saltville were to be erected. The plaintiff says he knew no other.

Evidence was given to the jury on behalf of the plaintiff tending to show that the works and machinery erected under his direction and superintendence were of the most approved design and the best known for the purpose; that he gave to the business faithful and skillful attention; that he spent the first three years of the contract continuously at Saltville, with only such vacation as could be availed of without detriment to his duties; that after the expiration of the three years he gave to the business, by correspondence and suggestion, such attention as was necessary to promote the defendant's best interest. He testified that the works were reasonably successful, but that disappointment as to the results arose from the poor quality of the limestone near the works and the weak nature of the brine pumped from the wells; that the impurities of the limestone choked the pipes and caused delays and expense; that great expense arose from the placing of the works at the foot of a mountain close to the river's bank, for which location he was not responsible.

The defendant on its behalf offered evidence tending to prove that the works were badly designed and constructed by the plaintiff; that the machinery was antiquated in design, unsuitable, and unreasonably costly; and that the plant had to be largely reconstructed before it could be successfully operated. Among the exceptions and assignments of error relied upon by the defendant corporation was the refusal of the court to allow the defendant to ask the plaintiff the following question in cross-examination:

"Q. I ask if the reason why you didn't return to the United States (after leaving in June, 1896) was because Mr. Johnston was appointed general superintendent?"

And the further question:

"Q. If Mr. Johnston had not been appointed superintendent, would you have returned to the works at Saltville?"

The contract provided that, after the expiration of the initial three years which the plaintiff elected to remain in the United States, he should not be required to spend any more time in America than he might elect to spend, but should give such attention to the business as might be necessary in order to promote its best interests. Being asked on cross-examination why he did not return in 1896, he replied that he had no reports from the works and was not asked to come, and that he was not obliged to come according to the contract; and in answer to another cross-question he said he had no reason for not returning, except that he was not wanted. The court sustained the objections of plaintiff's counsel to the above-recited questions, for the reason, as stated by the court, that, the plaintiff not being by his contract required to come to the United States unless some exigency occurred which made his presence essential and notice of it given to him, the questions were an attempt to contradict the witness on an immaterial point. We agree with the trial court. There being no legal obligation on the plaintiff to come again to the United States after 1896, unless notified of some necessity, it was unimportant whether, if Mr. Johnston had not been appointed superintendent, he might have come or not. The notice to the plaintiff that Mr. Johnston had been appointed general manager was as follows:

"Providence, R. I., April 29th, 1906.
"Personal.

"T. T. Mathieson, Esq., Saltville, Va.—Dear Sir: It is possible that I may not see you before your arrival at Saltville, in which case I beg to advise you of our present organization as planned by the board of directors. Mr. J. V. Johnston has been elected general manager, with entire and full charge of the works, and Mr. Charles Perry assistant general manager. During your stay there at this time I trust you will aid Mr. Johnston in all possible ways, giving him the full benefit of your experience, and I hope you may be able to materially aid him. I am sure your advice will be received by Mr. Johnston gladly, and, indeed, sought. For the present we desire to avail of your valuable services in the way of expert advice and information, but direct control and management of affairs at the works we desire committed fully at present to Mr. Johnston.

"Yours truly,                    Edward E. Arnold, President."

On May 11, 1896, the president wrote the plaintiff at Saltville, asking him to advise with regard to the arrangement of the internal cooling pipes in the towers, and on May 14, 1896, the plaintiff replied from Saltville, stating that he had spoken about the cooling pipes and they had been ordered. These letters show that the services the defendant expected the plaintiff to render under the contract after April 29, 1896, were in the way of expert advice and information, and upon plaintiff's return to England the defendant's officers did write him and receive replies on these topics. On May 7, 1896, the plaintiff wrote Mr. Arnold from Saltville:

"I duly arrived here, and found the works doing well. They are running three units, and turning out nearly the full quantity. If the brine and water supply were up to requirements, there would be no trouble. Will you kindly tell me if I may expect the company to pay my expenses for this trip, as I wish to make all arrangements. Of course, I am giving no orders, but am leaving a list of matters which require attention with Mr. Johnston."

On June 9, 1896, President Arnold wrote the plaintiff:

· "Your report, accompanied by letter written at Windsor Hotel and copy of one written by you to Mr. Ely, are at hand, both of which I submitted at a meeting of our directors. I am instructed by the directors to reply that it is the intention of our company to fulfill the spirit and letter of the contract between ourselves, and I do not wish you to construe anything in my letter to you of April 29th in a contrary light."

During 1897, while plaintiff was in England, there was constant correspondence with him, asking for information as to what processes other manufacturers were using, and asking his advice in respect to many other matters, to which letters the plaintiff replied fully. There was correspondence, also, with regard to the unpaid salary, in which the defendant's officers requested that the plaintiff accept the company's bonds in payment; and it is conceded promises were made to the plaintiff to adjust his salary, and that the plaintiff was never notified that his salary would be disputed until this suit was instituted.

Another exception and assignment of error arose as follows: The defendant examined a witness, H. A. Gadd, general superintendent of a manufactory of soda ash and caustic soda in Ohio, and an expert. He testified that he examined the works at Saltville in 1899, and that, taking it to have been substantially the same as in 1893, it was not, as constructed, a first-class, up-to-date plant, and that the design of the plant was not proper; that in 1899 there were overtures to his company from the defendant company to combine the two plants. He was then asked:

"Did the negotiations between your company and the Mathieson Alkali Works lead to contract? and, if not, state the reason."

To which question the plaintiff's counsel objected as immaterial and irrelevant. The witness answered that it did not lead to contract, and the reasons were that the plant at Saltville was so antiquated and old-fashioned that his company decided that it would cost more to tear it down and erect another in its place than it would cost to go to another location and erect an entirely new plant. The court sustained the objection, and excluded the question and answer. We think there was no error in this ruling. The witness had been permitted to state with fullness all the facts, and to give his opinion as to the insufficiency and obsolete character of the plant as constructed; but a proposed deal between the two companies, one with works in Ohio and the other in Virginia, for a consolidation of their works, obviously involved many elements which the trial judge in his discretion rightly declined to permit being examined into collaterally in this trial.

Another exception and assignment of error arose as follows: The defendant produced a witness, Drill, an expert mechanical engineer, familiar with the manufacture of chemicals. The defendant proposed to ask him this question:

"Q. Following your experience and having heard the evidence in this case, do you consider that the compressors described as having been installed by Mr. Mathieson at Saltville in 1893 were suitable for the purpose for which they were installed?"

And the further question:

"Q. You have heard the testimony as to the gas compressors installed by Mr. Mathieson in 1893. Were those compressors suitable for the purpose for which they were installed?"

The objection to these two questions were sustained by the trial judge upon the ground that the question did not with proper clearness set out the supposed facts or information or hypothesis upon which the expert was asked to give his opinion, so that it could not be known what constituted the unsuitableness of the compressor which the witness had in his mind; it being conceded that compressors are built in several different forms. But, even if this ruling was open to exception, no harm was done the defendant; for the witness proceeded to testify specifically with regard to the Saltville compressors, and to state the objections he entertained to them as to material and design, and why they were in his opinion not efficient and not suitable, and had been superseded in well-designed plants. So that the defendant had the benefit of all that the witness could have said in answer to the question.

Another exception and assignment of error was the refusal of the court to allow defendant's counsel to ask an expert witness, Stroebel, the following question:

"Q. Did you, or not, in England, in 1885, see in use better compressor engines than those installed by Mr. Mathieson at Saltville?"

The plaintiff's objection to this question was sustained; the court giving the following reason:

"Because the witness is asked for a comparison with something within his own mind, knowledge, and observation, affording the plaintiff no opportunity or means of controverting anything whatsoever that the witness might say."

We are satisfied there was no error in this ruling. The question was too general.

Another exception and assignment of error arose as follows: The witness Stroebel, a mechanical engineer, having testified that the gas compressors installed by the plaintiff which were of English make were not equal in efficiency and economy to those of American manufacture of the same date was asked:

"At what price could gas compressors of the capacity of those installed by Mr. Mathieson, and equal in efficiency and economy, and equally well adapted for the purpose then in view, have been bought from American makers in the year 1892 and 1893?"

And the witness answered at about $9,000 for each compressor. Mr. Arnold, the president of the defendant corporation, and who was its executive head in all dealings with the plaintiff, had testified that he did, before the compressors were ordered in England, ask manufacturers in America to give estimates for the gas compressors, and in a letter written by him to the plaintiff January 29, 1892, he quotes from a letter of an American engine builder an estimate that the cost of twelve vertical compressors f. o. b. at the engine works would be $260,000. In a letter to the plaintiff's father, April 28, 1891, Mr. Arnold wrote:

"I think, and it is the general opinion of those joining us in the enterprise, that it may be well to build one set of engines on your side as you suggest."

The trial judge excluded the question and answer of the witness Stroebel with regard to the cost of compressor engines procurable in the United States, for the reason that it did not seem just that the plaintiff, who was a resident of England, and not a mechanical engineer, and whose experience was limited to alkali plants, should be held responsible for not having known the fact that American engines could be purchased more cheaply than English engines, unless it was shown that it was a fact generally known in England at the date, by persons in like situation and employment with the plaintiff, or was directly made known to him.' There does not seem to us to be reversible error in this ruling. The plaintiff did not hold himself out as in a general sense a mechanical expert, but as having experience in managing alkali works, and as knowing the proper requirements in the construction of such works. There was testimony tending to show that it was the Mathieson works at Widnes, England, which in all their plans and contracts the defendant's president (Mr. Arnold) and the plaintiff had in mind as the type and general model of the works to be constructed at Saltville, Va., and were to the knowledge of Mr. Arnold the works with which the plaintiff was familiar and was competent to superintend in construction and operation.

The court permitted, over the objection of the defendant, the plaintiff to ask a witness, Tapless, who had been employed 7 years at Widnes and 11 years at Saltville: "Q. You have stated that you are familiar with the works at Widnes and the works at Saltville. Which is the better?"—and permitted the answer that the Saltville plant was the best, and also a similar question and answer by the witness Neil Mathieson. Exception was also reserved to a question asked of John Allen, who supplied pumps, valves, and presses to the defendant's works, and had also supplied the same things to the Widnes plant and other chemical works. He was asked:

"Q. Will you tell what you have to say regarding the plant, apparatus, and machinery at the Mathieson works at Widnes, as regards its up-to-date character? I am talking now of 1892, when you secured your order."

He answered:

"Well, as far as we know, it was the only class of valve and pump and press that was in use at that time. There was no other kind of that class of work in use but the kind we made. We and other firms are making similar goods.

"Q. Would you say it was of an up-to-date character?

"A. Yes."

Exception was made to overruling the objection to a question to Marcus Allen, who testified he was a consulting engineer in the chemical branch of the business and knew the works at Widnes thoroughly. He was asked as to the efficiency and up-to-date character of the plant and machinery, and answered that it was up to date, and was similar to that of other firms of similar class making ammonia soda alkali, and that he knew of nothing better in use, and that it could not be said that the Widnes works were obsolete.

In none of the rulings can we see any error. Of all these exceptions to the admission or rejection of testimony it may be fairly said,.

considering the large amount of direct testimony adduced by the defendant and admitted in support of the issues raised by its pleas, that its admission or rejection could not have in reason affected the verdict of the jury and could not have injuriously affected the defendant.

We now come to the assignments of error with respect to the instructions given by the trial judge to the jury and with respect to the refusal to give those offered by the defendant. It is settled law that it is no ground of complaint that the trial judge refuses in instructing the jury to adopt the language proposed by counsel. He may present the case in his own way, using his own language, provided he covers the entire case and declares the law correctly. Indianapolis v. Horst, 93 U. S. 291–295, 23 L. Ed. 898; New York & L. E. R. R. Co. v. Winter's Adm'r, 143 U. S. 60–74, 12 Sup. Ct. 356, 36 L. Ed. 71. The court refused the instructions asked for by both the plaintiff and the defendant, and the following are the instructions which the court in its own language gave the jury:

The court's instruction No. 1:

"The contract in question gave to the plaintiff the option to make his residence at Saltville during the first period of his service for two or three years, and during said time he had the right to take such vacation as could be availed of without detriment or hindrance to the proper management of the business of the company. For the remainder of the full term of eight years the said Mathieson was not required by the contract to spend any more time in America than he might elect to spend; but he was required to give such attention to the business of the company as may have been necessary in order to promote its best interest. It follows that mere absence in England during the second period of the employment was not of itself a breach of contract by the plaintiff, unless the jury shall consider, under all the evidence in the case, that his presence in America was required in order that he could give such attention to the business as was necessary in order to promote its best interests. In other words, the court construes the contract in this respect as not requiring the presence of the plaintiff in America unless some exigency occurred which made it essential to the promotion of the best interests of the company that he should be in America."

The court's instruction No. 2:

"The burden of proof is on the plaintiff to show that he performed the express and implied obligations of the contract in a reasonably efficient and competent manner. And the burden of proof is on the defendant to show as a ground of counterclaim the converse of this state of fact and to prove damage. In a civil case such as this the burden of proof is sustained by a preponderance of evidence."

The court's instruction No. 3:

"If the jury believe from the preponderance of evidence that the plaintiff reasonably performed the obligations of his contract, they should find for the plaintiff in the amount sued for."

The court's instruction No. 4:

"If the jury believe from the preponderance of the evidence that at the time of the performance of the contract the plaintiff did not have and exercise reasonable knowledge, skill, and care for and in the performance of the duties devolving on him under said contract, and that the company suffered damages thereby, the court instructs the jury that in arriving at their verdict they should deduct from the claim of the plaintiff the amount of the said damages. and that. if the amount of said damages exceeds the claim of the plaintiff, a verdict over for such excess against the plaintiff and in favor of the defendant should be given."

The court's instruction No. 5:

"If the jury believe from the preponderance of the evidence that the plaintiff, solely because of ignorance, incompetence, or negligence, erected for the defendant works of an antiquated style and plan, and such as were insufficient for the purpose intended, and placed therein engines, pumps, and other machinery and appliances which were antiquated and insufficient, and at an expense which was unreasonable and unnecessary, allowances may be made in behalf of the defendant of the damage, if any, thus occasioned, whether by original cost, by loss in operation, or by necessary repairs and reconstruction. But in this connection the jury will consider whether or not the plant at Widnes, England, was contemplated by both parties to the contract as the model after which the Saltville plant would be constructed, and whether or not this contemplated design was reasonably carried out."

The court's instruction No. 6:

"The jury are instructed that when the plaintiff entered into the contract of employment of August 15, 1893, the law implied a promise and undertaking on his part that he would use reasonable care and diligence, and that he had and would exercise reasonable skill and knowledge in the prosecution of his duties under said contract. But in deciding on this question the jury will consider the knowledge had by the defendant at the time of making the contract of the previous experience and training of the plaintiff."

The court's instruction No. 7:

"The court instructs the jury that the contract sued on by the plaintiff is an entire one, and that he cannot in any event recover the entire amount sued for by him, unless they believe that he performed in the manner above set out each and every material duty required of him under said contract."

These instructions, it seems to us, are correct in law, and were comprehensible by the jury, and fully and fairly covered the case made by the pleadings and the evidence. The defendant's counsel pointed out to the court no specific error, and excepted to the court's instructions only so far as they were in conflict with the 12 instructions asked for in behalf of the defendant. It would be useless to analyze the 12 propositions offered by the defendant and to compare them with court's instructions. In our opinion there is no substantial conflict between the court's instructions and the propositions of law expressed in the instructions asked by the defendant. The only really material difference is in the qualifications which the court made in its fifth instruction by suggesting to the jury that, in determining whether the works at Saltville were antiquated and insufficient, they might consider whether or not the plant at Widnes, England, was intended by both parties to be the model for the new works at Saltville. This qualification, as expressed in the fifth instruction, we think, was proper and justified by the evidence both on behalf of the plaintiff and defendant. The other qualification made by the court was in its sixth instruction, viz., that, in deciding whether the plaintiff had exhibited the skill and knowledge which the contract implied that he possessed, the jury should consider the defendant's knowledge of the plaintiff's previous training and experience. This, it seems to us, was a reasonable and proper qualification. The defendant's president, who made the contract, knew that the plaintiff had no experience with the new and difficult conditions which embarrassed the establishing of the new works in America, but chose, for reasons that can only be surmised, to urge him to come to America and to enter into a contract for eight years.

It seems to us that the trial judge conducted the case with painstaking care and with the steady purpose of fully and fairly getting it before the jury and of instructing them as to the law applicable to it in clear and intelligible language. The verdict is large, but it was justified by the contract. A motion for a new trial was overruled by the trial judge, who had heard all the evidence and had seen the witnesses. The jury probably were impressed with the idea that the disappointment of the extravagant hopes of the promoters of the enterprise was due to the failure to find close at hand material of the quality and kind that was expected, and not due to the fault of the plaintiff; that the defendant's officers never, until suit was entered, disputed the plaintiff's right to his salary under the contract, and never notified the plaintiff, directly or indirectly, that the defendant wished to end the engagement. The issue also as to whether the plaintiff was answerable for any damages sustained by the defendant was fairly left to the jury and was determined by them.

Judgment affirmed.

BOYD, District Judge (dissenting). I concur in the opinion of the court as to the law in regard to the question of jurisdiction raised, and also the amendment to plaintiff's pleading; but I am not in harmony with the conclusion that the judgment of the court below should be affirmed. Without going into the case and considering all of the exceptions, of which there are many, I think there are certain of them taken to the admission and exclusion of testimony in the trial in which there is error. The plaintiff below introduced a witness by the name of Tapley, to whom this question was propounded:

"Q. You have stated that you are familiar with the works at Widnes and the works at Saltville. Which is the better?"

The defendant's counsel objected to this question. The objection was overruled, and the witness permitted to answer; his answer being as follows:

"A. The Saltville plant was the better."

The defendant's counsel also objected to the answer, and the objection was overruled, and there was an exception.

There is no pleading or issue in the case which involves a comparison between the works at Widnes, which is in England, and the works at Saltville. The contention of the defendant was that the plaintiff had failed and neglected to erect and equip the Saltville plant properly, and the issues raised are substantially as to whether the plaintiff discharged his duty to the defendant in this respect as contemplated by the contract. Consequently it became necessary to inquire whether or not the plaintiff had been negligent and careless in the erection of the Saltville plant and the selection and purchase of machinery and appliances for its operation. There is no stipulation in the contract that the plant at Widnes was to be the model after which the Saltville plant was to be constructed. Therefore testimony as to what the Widnes plant was could not be pertinent. If a witness partial to the Widnes plant could be permitted to testify that it was a good plant and that the Saltville plant was better, then another witness would be competent

to testify that the Widnes plant was bad and the Saltville plant worse. The issue would thus be transferred from the question of faithful discharge of the plaintiff's duties under the contract to an investigation of the relative merits of the two plants. Further, it may be that the Widnes plant was a good one, that it was well adapted to the purposes for which it was erected in the locality in which it was situated, and yet its construction and equipment might have been entirely unsuited to the conditions surrounding the plant at Saltville. The injection of such testimony was calculated to mislead the minds of the jury from the true issue, and to cause them to consider the character of the two plants, rather than the question whether the plaintiff had erected such a plant at Saltville as his contract required. I think, therefore, that the admission of this testimony was error.

The next exception which I will consider is one relating to the exclusion of testimony offered by the defendant. In order to fully understand the purposes of the testimony, I deem it necessary to recite certain of the facts, and among them the following I take from the testimony of the plaintiff himself:

"I was general manager in the construction of the Saltville plant, and everybody else was under me. I brought out several ·skilled people to help me. After execution of the contract, which was August 15, 1893, I returned to Saltville and remained there for two years, working, erecting the plant, or almost two years, when I returned to England with my family, in July, I think, 1895, and returned again, as far as I remember, in September of the same year. As stated, returned to Saltville in September, 1895, having started a portion of the plant on the 4th of July, 1895. I remained at Saltville until late in December; I think about the 18th of December. On returning and receiving my account from R. T. Wilson & Co., with whom I banked, I found that they had reduced my salary from £3,000 to £1,500, dating from the day I left Saltville, in December, 1895. I remained then in England for some time; had correspondence with Mr. Arnold, and letters with relation to the business; looked after the ordering of some machinery for them, which Mr. Arnold instructed me to order. I did not return until in April, 1896. I left England late in April, arriving at Saltville early in May, 1896. When I arrived in New York, I found that another manager had been appointed. Mr. Arnold informed me so, and the men were to take all instructions from him. The new manager was Mr. J. V. Johnson. Finding that another manager had been appointed, and knowing from Mr. Arnold that the men would take their instructions from him, I simply wrote to Mr. Arnold that I would give him all the instructions I could. At this time Mr. Arnold was president of the company."

And the plaintiff also introduced the following letter, dated at Saltville, Va., May 7, 1896, addressed to Mr. Arnold and signed by the plaintiff:

"I duly arrived here, and found the works doing well. They are running three units, and turning out nearly the full quantity. If the brine and water supply were up to requirements, there would be no trouble. Will you kindly tell me if I may expect the company to pay my expenses for this trip, as I wish to make all arrangements. Of course, I am giving no orders here, but am leaving a list of all matters which require attention with Mr. Johnson."

It is is a further fact that shortly after the date of this letter the plaintiff left the United States and did not return again during the existence of the contract. The plaintiff, Mathieson, was introduced as a witness in his own behalf, and upon cross-examination the counsel for defendant propounded the two following questions:

(1) "Q. I will ask you if the reason you did not return to the United States [meaning from June 1, 1896, to February 1, 1901, the end of the period covered by the contract sued on] was because Mr. Johnson was appointed general superintendent?"

(2) "Q. If Mr. Johnson had not been appointed general superintendent, would you have returned to the works at Saltville during the period of your contract?"

Both of these questions were ruled out by the trial court, to which the defendant excepted. The selection of Johnson shows that in the opinion of the authorities of the company it was necessary to have some one present at the plant to superintend and manage its operations. The plaintiff was not there, as he admits, and in fact he admits that he was absent for the whole of the time for which he seeks compensation and for which he recovered a judgment, principal and interest, aggregating upwards of $40,000. He was in England, and a few letters written by him constituted, so far as is shown by the record, all that he did, for which he recovered this large sum of money. It is set forth in the contract that, after two or three years of the time had elapsed, it was agreed that for the remainder of the time the plaintiff was not required to spend any more time in this country than he might elect to spend; but there is a qualification immediately following, viz.:

"The object and purpose, however, being that he shall give such attention to the business as may be necessary in order to promote its best interests."

Even if this requirement had not been expressly stated, under the circumstances the law would construe the contract to include it. It is an undisputed fact that the plaintiff had contracted to discharge the duties of general superintendent of this company for eight years. Such portion of the first three years as might be necessary was to be devoted to the construction and equipment of the plant, and the remainder of the time he was to give such attention to the business as might be necessary in order to promote its best interests. In the trial of the case the defendant was resisting the right of the plaintiff to recover primarily on the ground that he had failed to comply with the contract, that he had not served the best interests of the company, that he had remained away from the business of the company from some time in 1896 to the expiration of the contract, that he had left the plant and its operation without a superintendent to manage and direct its affairs, and that when the defendant, in this condition, had been compelled to select Johnson as superintendent, the plaintiff became displeased and gave himself no further concern about the company's business. In view of this, it was undoubtedly competent for the defendant to show that the plaintiff had remained away and neglected the interests of the business because of Johnson's appointment. It might well be argued, upon the testimony of the plaintiff himself, in which he said, upon his visit to Saltville in 1896, that, "finding another manager had been appointed and knowing from Mr. Arnold that the men would take their instructions from him, I simply wrote Mr. Arnold," etc., and, further, in the letter of May 7, 1896, in which he says, "Of course, I am giving no orders here, but am leaving a list of all matters which require attention with Mr. Johnson," that the theory of the defendant was true—that because of the appointment of Johnson the

plaintiff had made up his mind to take no further interest in the affairs of the company.

I note in the record the grounds upon which the trial court excluded the first of these two questions, which are as follows:

"The second paragraph of the contract, while calling for such attention from Mr. Mathieson as the business may require, does not require him to come to America after the expiration of the first period, but gives him the option in that respect. Consequently, as he was not required by the contract to be in America at all from 1896 to 1901, any effort now to contradict the witness as to his reasons for not coming here would be an effort to contradict on an immaterial point."

And in excluding the second of these two questions and the answer thereto, the court made this statement:

"The contract is probably rightly to be construed as meaning that, if some exigency occurred which made the presence of Mr. Mathieson in America essential to the proper conduct of the plant, his presence here would be required in order to comply with his contract; but the court is of the further opinion that notice of such exigency should have been conveyed to Mr. Mathieson before his presence in America during such period could have been required. No avowal having been made that such notice was given to Mr. Mathieson, the court is of the opinion that he need not answer the question."

I am unable to concur in this construction of the contract. The agreement was to pay plaintiff £1,500 ($6,000 in our money) per annum for the remainder of the period covered by the contract, after the two or three years set apart in the first paragraph for the erection, etc., of the plant, had elapsed. The obligation of plaintiff to the company, however, did not cease when the specific work provided for in the paragraph named had been completed. He was employed as general superintendent for the term of eight years, and he was bound by the contract to discharge faithfully and fully the duties attaching to that employment, whatever such duties may have been. It is true, as before stated, that it was agreed that he "shall not be required to spend any more time in America than he may elect to spend," and the trial judge construed this to mean that the plaintiff was not required to come to America at all after the expiration of the first period, but that the contract gave him the option in that respect. In my opinion it devolved upon the plaintiff to elect to spend enough of his time here to subserve properly the purposes of his employment and promote the best interests of the defendant. Under the terms of the first paragraph of the contract, during the two or three years for the construction, etc., of the plant, it is provided that plaintiff "is to have such vacation during this period as he can avail of without detriment or hindrance to the proper management of the business of the said company." The latter clause of paragraph 2 is substantially the same in effect; for, whilst the clause confides it to plaintiff to spend only such time in America as he may elect, yet in the exercise of this election he must "give such attention to the business as may be necessary in order to promote its best interests." It was incumbent upon him to keep himself informed as to the condition of the establishment of which he was the general superintendent. How else could he consult its best interests? If his presence at the works was necessary, it was his duty to know it; not that of the defendant to advise him. I have the right to

assume that in making this contract the defendant relied upon the skill and capacity of the man employed to superintend the work, and had confidence in his judgment and discretion. I do not understand that under the terms of the contract it was the right of the plaintiff to absent himself altogether 'from the plant, but that, whilst it was left to him to spend such time here as he might elect, this privilege was to be exercised with due regard to the interests of the company. I think, therefore, that it was competent for the defendant to show, if it could, by its own witnesses or by cross-examination of the witnesses for the plaintiff, that plaintiff had failed to give the attention to the business of defendant required of him by the contract—to show, if possible, that because he was piqued on account of the appointment of Johnson he ceased to fulfill his obligation as general superintendent. I am there-fore 'of the opinion that the ruling of the court excluding the questions under consideration was error, that the questions were competent and material, and that defendant was entitled to have severally thereto the answer of the witness.

There are a number of other exceptions, some of them taken during the trial to the admission and exclusion of testimony, and others based upon the charge of the court to the jury. I do not deem it necessary, however, to consider them, or any of them. It appears to me, from reading the record of the course of the trial, that many of the rulings made by the learned judge presiding were the result of his construction of the contract sued upon, in which construction, as I have before stated, in my opinion, there was error.