### MAGNA OIL & REFINING CO. v. WHITE STAR REFINING CO.

(Circuit Court of Appeals, Third Circuit. March 7, 1922.)

No. 2749.

1. Sales ⊕═173—Under contract, delay in making connections with seller's oil wells held not breach, if buyer used best endeavor to prevent delay.

Under a contract for the sale of oil, deliverable at the seller's wells in approximately equal daily quantities to a third person's pipe line, which required the purchaser to make all necessary arrangements for receiving the oil and to use their utmost endeavor to prevent delay, the purchaser was not absolutely bound to have pipe line connections made by the pre-

scribed time for commencing delivery, and if it used its utmost endeavor to prevent delay in having the pipe line connected with the seller's tanks, such delay did not constitute a breach, but merely increased the daily deliveries during the rest of the contract period.

2. Sales ⬫151—Seller held not ready and able to deliver oil, where its oil was mingled with that of other persons.

Under a contract for the sale of oil deliverable at the seller's wells to a third person's pipe line, the seller was not ready and able to deliver oil, where other persons owned parts of the oil in seller's tanks until the pipe line company or the buyer received authority from such other persons to take the oil, and if the buyer was ready, able, and willing to receive the oil the contract was broken by the seller.

3. Sales ⬫418(2)—Damages for nondelivery based on market value reasonable time after seller's promises to deliver overdue installments.

If a seller of oil which had failed to make delivery at times prescribed by the contract promised to make deliveries of overdue installments, and the buyer waited for a reasonable time thereafter, it was entitled to have its damages for the nondelivery of the oil ascertained on the basis of the difference between the contract price and market value of like oil on the expiration of such reasonable time.

4. Sales ⬫384(1)—Buyer of oil held not liable for seller's loss of oil by seepage from new wells, etc.

Though a buyer of oil was informed that if it did not take the oil as required by the contract, the seller would lose oil through seepage, etc., buyer held not liable for oil lost by seepage by reason of an increase in the number of wells in the vicinity, or in the activity of new wells, or in the greater activity of old wells on adjoining properties.

5. Corporations ⬫514(1)—Averment of corporate existence means legal existence.

An averment in a pleading that a corporation exists under and by virtue of the laws of a state by legal intendment means that it legally exists.

6. Corporations ⬫634—Have no existence beyond limits of state of creation.

A corporation, a legal entity or person which exists by force of law, can have no existence beyond the limits of the state which creates it and endows it with faculties and powers, and it is a citizen of that state.

7. Corporations ⬫634—May not migrate, but may carry on business in other states.

A corporation created in one state may not migrate from state to state, but may carry on business and exercise its charter powers in another state, by complying with the laws of that state.

8. Corporations ⬫634—Effect of special enabling act authorizing foreign corporation to do business stated.

Where the purpose of the Legislature in passing a special enabling act authorizing a particular foreign corporation to do business in the state is to make such corporation its own, it thereby creates a new corporation, with a new existence, and, though the two corporations may have the same name and powers, each exists independently by virtue of the laws of its own state; but if the purpose is not to create, but simply to enable, permit, and control, the corporation is not a citizen of the enabling state, but remains a foreign corporation.

9. Courts ⬫322(3)—Allegation that corporation was created or exists under laws of particular state imports that it was both created and existed.

Continuance, as well as creation, of corporate existence is essential to the jurisdiction of a federal court on the ground of diverse citizenship, and the proper allegation is that the corporation is a corporation created and existing under the laws of a particular state; but an allegation that it was created or that it exists under the laws of a particular state imports that it was created and is existing under such laws.

⬫For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

**10. Courts ☞322(2)—Sufficient that requisite citizenship or facts constituting citizenship are alleged anywhere in the record.**

Where jurisdiction depends on diverse citizenship, the whole record may be looked to for the purpose of curing a defective averment of citizenship, and if requisite citizenship is anywhere expressly alleged, or if facts are stated which in legal intendment constitute such averment, it is sufficient.

**11. Courts ☞322(3)—Admission of corporate existence as alleged held admission that corporations were citizens created and existing under laws of states named.**

Where the declaration alleged that plaintiff was a corporation existing under the laws of Michigan, and defendant a corporation existing under the laws of Delaware, an admission at the trial of the corporate existence of the parties as alleged and their citizenship was an admission that they were corporations and were citizens created and existing under the laws of the states mentioned.

**12. Appeal and error ☞273(5)—Exception to the charge, without pointing out matters obbjected to, held insufficient.**

An "exception to the charge" is a general exception, contrary to rule 10 of the Circuit Court of Appeals for the Third Circuit (224 Fed. vii, 137 C. C. A. vii), which provides that the party excepting shall state distinctly and separately the several matters in the charge to which he excepts, and that only such matters shall be included in the bill of exceptions.

**13. Sales ☞421—In buyer's action for seller's breach, charge held full and correct.**

In a buyer's action for breach of a contract for the sale of oil to be delivered at the seller's wells to a third person's pipe line, in which the seller charged the buyer with breaking the contract and filed a recoupment in damages, the charge *held* to clearly analyze the facts, fully state the issues, and correctly expound the law.

In Error to the District Court of the United States for the District of Delaware; Hugh M. Morris, Judge.

Action by the White Star Refining Company against the Magna Oil & Refining Company. Judgment for plaintiff, and defendant brings error. Affirmed.

The charge was as follows, the parts covered by the syllabus being the parts assigned as error:

Gentlemen of the jury: The plaintiff, White Star Refining Company, a Michigan corporation, seeks by this action to recover from the defendant Magna Oil & Refining Company, a Delaware corporation, damages for an alleged breach of a contract made between the plaintiff and the defendant on the 22d day of October, 1919, for the sale by the defendant and the purchase by the plaintiff of 100,000 barrels of Burkburnett crude oil, under the terms and conditions therein mentioned. That contract provides:

"That, for and in consideration of one dollar ($1.00) in hand paid, each to the other, receipt of which is hereby acknowledged the seller hereby agrees to sell, and the purchaser hereby agrees to purchase one hundred thousand (100,-000) barrels of fresh Burkburnett crude oil for delivery at the seller's wells to the gathering line of the Empire Pipe Line Company, in approximately equal daily quantities during the period of ninety (90) days beginning November 1, 1919, and ending January 28, 1920, the price for said Burkburnett crude oil to be one dollar and sixty cents ($1.60) per barrel of forty-two (42) gallons each at the seller's wells. It being understood that this is a flat price and not based upon the fluctuations of the crude oil market. It being further understood that the terms of payment for such crude oil are cash upon presentation of signed delivery receipts, and time being the essence hereof, the seller may at its option, on failure of the purchaser to make prompt payment,

☞For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

terminate this contract forthwith. Before this contract shall become binding, as security for the prompt payment of all amounts due the seller from the purchaser, the purchaser will deposit, in escrow, with the First National Bank in St. Louis, of St. Louis, Missouri, the sum of sixteen thousand ($16,000.00) dollars, subject to the terms of this contract, and will cause written notification by United States mail to be given by the escrow holder to the seller of such deposit for such purpose; it being understood that all current payments are to be made by the purchaser without recourse to the escrow fund, leaving the escrow fund intact for the payment of any delinquency.

"The purchaser is to make all necessary arrangements for receiving said crude oil during the period mentioned and to use their utmost endeavor to prevent delay. The seller agrees to deliver all oil promptly, but the seller shall not be liable for failures to make deliveries where such failures arise on account of fires, strikes, or any other causes beyond its control, and the purchaser agrees to accept said crude oil promptly and without delay, but will not be liable for not accepting same when inability to do so is the result of fires, strikes, or other cause beyond its reasonable control."

The making and execution of the contract is admitted, as is also the fulfillment by the plaintiff of the provision therein touching the deposit of $16,-000 in the First National Bank in St. Louis, Mo. It is also admitted that of the 100,000 barrels of oil specified in the contract the plaintiff did not receive 97,972 barrels thereof. Consequently the main question for your determination is whether the fact that the plaintiff did not get the full quantity of oil to which it was entitled under the contract was due in whole or in part to its failure to observe the terms and conditions of the contract, or was, on the other hand, due to the failure of the defendant to observe in whole or in part such terms and conditions. This is the crucial question for your determination. But inasmuch as the contract provides, not only for the delivery and acceptance of 100,000 barrels of oil, but also for delivery thereof, "at the seller's wells to the gathering line of the Empire Pipe Line Company in approximately equal daily quantities during the period of 90 days beginning November 1, 1919, and ending January 28, 1920," and further that "the purchaser is to make all necessary arrangements for receiving said crude oil during the period mentioned, and to use their utmost endeavor to prevent delay," and as it is conceded by the plaintiff that the gathering lines of the Empire Pipe Line Company were not connected with any storage tanks at the defendant's wells until a few days after November 1, 1919, and that they were then connected, not with the tanks on each of the leases of the defendant company, but only with the tanks on lease No. 2, otherwise designated as the Taylor tract, or lot No. 12, in block 98, and as no further pipe line connections were made until on or about the 2d day of December when connections were made with the wooden tanks on lease No. 1, otherwise known as the Lanier tract, and as no oil was received by the pipe line company from the defendant for many days after the original pipe line connections had been made, the problem, Who broke the contract? becomes and is, even without reference to contentions of the parties not supported by admitted facts, a complex one, the solution of which depends in large measure upon the determination of subordinate problems of both law and fact.

[1] Let us first consider the effect of the nonconnection of the pipe line with the tanks of the defendant company until some days after the 1st day of November. The plaintiff asserts that the only effect thereof was to increase the amount of the daily deliveries of oil during the unexpired portion of the contract period, and bases its assertion upon that clause of the contract which provides that the "purchaser is to make all necessary arrangements for receiving said crude oil during the period mentioned, and to use their utmost endeavor to prevent delay," and upon its contention that the evidence discloses that it, the plaintiff, did use its utmost endeavors to prevent delay in the installation and connection of the pipe lines, and that such delay as did occur was beyond its reasonable control. The defendant, on the other hand, contends that each day's delay after November 1 in making the pipe line connection with the tanks of the defendant had the effect of striking a day's installment of oil out of the contract and finally discharging

the defendant from its obligation to that extent. These contentions make it necessary that the meaning of the clause of the contract relied upon by the plaintiff in this particular be stated to you for your guidance.

While it is true that the contract provides that the plaintiff should make all necessary arrangements for receiving the oil during the contract period, yet as it also provided that the plaintiff was to use its utmost endeavor to prevent delay, and as it further designated the particular pipe line to be connected and to which delivery of the oil was to be made, namely, the gathering line of the Empire Pipe Line Company, and as the Empire Pipe Line Company is an independent company, not owned or controlled by either of the parties to the contract, the plaintiff was not bound absolutely and at all events to have the connections made on the 1st day of November, but was obligated merely to use its utmost endeavor to prevent delay in the making of the pipe line connections. Any other construction would deprive the words of the contract "to use their utmost endeavor to prevent delay" of any meeting, a construction to be avoided. Consequently, if you find from the evidence that the plaintiff did use its utmost endeavor to prevent delay in having the Empire Pipe Line Company connect its lines with the tanks at the defendant's wells, you must find that the delay in making the pipe line connection did not constitute a breach of the contract by the plaintiff.

In such event the only effect of such delay was to increase the daily quantities of oil deliverable under the contract during the period of the contract remaining after the making of such connections. But, if you should find from the evidence that the plaintiff did not use its utmost endeavor to prevent delay in this respect, then you must find that there was a breach—a partial breach—by the plaintiff of the contract on each of the days of the contract period that elapsed before the first pipe line connection was made. The effect of such breach or breaches on the part of the plaintiff, if any there were, was to discharge the defendant from its obligation under the contract to make delivery of the oil that would have been deliverable during the period in question had the pipe lines been connected on the 1st day of November.

The remaining question touching the installation of the gathering lines of the pipe line company is whether adequate or sufficient connections were made with the defendant's tanks at its wells. The contract is silent as to the number of leases or the number of tanks with which the gathering lines of the Empire Line Company should be connected. Consequently, it was not incumbent upon the plaintiff to have a connection made with each tank on each of defendant's leases; but it was incumbent upon the plaintiff to have connections made only with such number of tanks upon any one or more of defendant's leases as would enable the defendant to deliver through its tanks to those lines, in the usual course of business and without unreasonable inconvenience to it, oil in the quantity and manner called for by the contract. Hence, if you find that the defendant could have made delivery of the contract quantity of oil through the tanks with which connections were in fact made, and could have made such delivery in the usual course of business without unreasonable inconvenience to it, you must also find that the connections made were proper and adequate under the contract, and that the plaintiff was without fault in this particular.

[2] It is conceded that, although the pipe lines were connected with the tanks of the defendant on the Taylor tract on or about the 6th, 7th, or 8th day of November no oil was run until on or about the 23d day of November. The plaintiff contends that it was ready, able, and willing during all of this period to receive the oil, and that its failure to receive the oil during this period was due solely to the fault of the defendant; that the fault of the defendant consisted in its failure to put itself in a position to deliver the oil, in that the oil in its tanks was to the knowledge of the plaintiff the commingled oil of the defendant and of the defendant's lessors; and that the pipe line company and the plaintiff were not justified in receiving such commingled oil without the consent in writing of those persons other than the defendant having a legal interest in such oil. If you find from the evidence that persons other than the defendant were the owners of a part of the oil in the tanks of the defendant, and that the oil of the defendant and of

such other persons was commingled, then you must find that the defendant was not ready and able to deliver oil under the contract until the pipe line company or the plaintiff received authority from such other persons to take such oil. If you so find, and if you also find that the plaintiff was during that period ready, able, and willing to receive the oil, then you must find that during each of the days that the defendant was not so ready and able to deliver the oil there was a breach of the contract on the part of the defendant.

After you shall have disposed of the issues of fact hereinbefore pointed out, touching the period from the 1st day of November to the date upon which the first pipe line connections were made, namely, on or about November 6th, 7th or 8th, and shall have disposed of the issues of fact touching the period beginning on the latter day and ending on the day on which the substitute for the division order was delivered to the plaintiff, or to the pipe line company, you will then consider the issues of fact now to be pointed out touching the remaining period of the contract. Concededly during this period the contract was broken. The plaintiff contends that it was then broken only by the defendant, while the defendant, on the other hand, contends that it was broken only by the plaintiff. Who broke the contract is a question that must be determined by you. As the contract here involved calls for delivery of the oil, not in one lot and at one time, but by daily installments, the question—by whom was the contract broken—must be determined by you as to each installment, for, though the contract is an entire contract for the whole quantity of oil, yet it is divisible in performance.[1]

When one party agrees to deliver an article at a certain time and place and another agrees then and there to receive it, in an action by the purchaser against the seller for the nonperformance of the contract, where, as in this case, the question of payment is not involved, it is sufficient for the purchaser to allege and prove that he was ready and willing, at the time and place appointed, to receive the article. In such cases the buyer's duty is to be present or have some one present at the time and place appointed, ready, and willing there to perform the contract on his part, i. e., to receive the article purchased; and, if the seller does nothing, the purchaser's right of action is thereupon complete. On the other hand, if the seller has the article ready for delivery at the time and place appointed, the buyer must show that he, or his representative, was there ready and able to receive it, before he can maintain an action for the nondelivery. But, if either party would enforce this contract against the other, he must do more than show the default of such other; he must show a performance or a readiness and willingness to perform on his part at the time and place appointed.[2]

The defendant contends that on or about the 8th, 9th, or 10th of December it elected to terminate the contract and so notified the plaintiff. If you find from the evidence in this case, when considered in the light of the principles of law governing this matter, now to be stated, that the defendant was entitled to terminate the contract, elected so to do, and notified the plaintiff of such election, the effect of such action on the part of the defendant was to discharge it from any obligation to make further deliveries of oil under the contract. But, before you may find that the defendant effectively terminated the contract, you must find that prior to the date of the alleged termination on the part of the defendant, the plaintiff had broken the contract as to one or more installments of oil, that such breach or breaches on the part of the plaintiff had not been waived by the defendant, that the defendant elected to terminate the contract, and that it notified the plaintiff of such election. You need no further instructions upon principles of law to enable you to determine whether before the 8th, 9th or 10th of December the plaintiff had broken the contract. If you find that the plaintiff had not theretofore broken the contract, then you must find that there was no effective termination of the contract on the part of the defendant; but if, on the other hand, you find that the plaintiff had broken the contract before the time at which the

---

[1] Benjamin on Sales, p. 816.

[2] Neis v. Yocum (C. C.) 16 Fed. 168; Greenwood v. Watson, 171 Fed. 619, 96 C. C. A. 421.

defendant elected to terminate, if it did so elect, you must then consider whether the defendant had waived such breach or breaches of the plaintiff.

Waiver is the intentional relinquishment of a known right. It may be found in the conduct as well as in the words of the party not in default. If you find that the plaintiff broke the contract, and that after such breaches were known to the defendant the defendant promised the plaintiff to make further deliveries of oil under the contract, or the defendant thereafter made subsequent unconditional deliveries of oil under the contract, and that the plaintiff did not after such promises or delivery of oil by the defendant, and before the date of the alleged termination of the contract commit a further breach or breaches of the contract, you must find that the breach or breaches on the part of the plaintiff were waived by the defendant, and that the defendant was without right to terminate the contract. If, on the other hand, you do not so find you must then find as a fact whether the defendant elected to rescind, and whether it gave notice to the defendant of its election. A mere threat to terminate or to abandon a contract is, of course, not a termination. Notice of an election to rescind, if given to Mr. Gerteis, would be sufficient, without regard to whether either Mr. Gerteis or the defendant then or subsequently repeated such notice to any officer or director of the defendant company.

After you shall have disposed of the question as to the termination of the contract by the defendant you should then inquire whether the contract was broken by the defendant as claimed by the plaintiff. If you find that the contract was terminated by the defendant in conformity with the legal principles above stated, the period of the present inquiry will be restricted to the period beginning with the day the pipe lines were connected with the Taylor tract and ending on the day upon which such termination was made by the defendant. If, on the other hand, you find that there was not an effective termination of the contract by the defendant, the present inquiry will be directed to the entire contract period after the date of the connection of the pipe lines with the Taylor lease. You must consider the question of defendant's breach as to each day during the period of the time covered by your inquiry. The principles of law by which you are to be guided in so doing have been hereinbefore stated. If you find that the defendant was not ready, able, and willing to deliver an installment or installments of oil to the plaintiff upon any day or days upon which the plaintiff was ready, able, and willing to receive the same, you must then find that upon each of such days the defendant committed a breach of the contract. If you do so find, the defendant would be liable in damages to the plaintiff therefor.

[3] The measure of damages to which the plaintiff would be entitled under such circumstances would, if the market value of the oil exceeded the contract price, and except for the matter hereinafter to be stated, be the sum of the differences between the contract price and the market value on the day or days upon which the breach or breaches by the defendant occurred;[3] but if, upon any such day or days, the market value did not exceed the contract price the damages to which the plaintiff would be entitled for such day or days would be nominal damages only. The plaintiff contends, and has offered evidence in support of its contention, that the defendant was from time to time until some time in the month of December charged by the plaintiff with failure to make delivery of installments of oil at the times appointed therefor by the contract, and that the defendant at such times promised the plaintiff to make delivery of the oil. If you find that such promise or promises were made by the defendant, and applied to installments of oil in arrear at the time of such promise or promises, and that the plaintiff waited for a reasonable time after the last of such promises for the defendant to make delivery of the oil so promised, the plaintiff is entitled to have its damages for the nondelivery of the oil so promised ascertained upon the basis of the difference between the contract price and the market value of like oil on the expiration

[3] Roper v. Johnson, L. R. 8 C. P. 167; Brown v. Muller, L. R. 8 Ex. 319; 24 A. & E. (2d Ed.) p. 1152.

of a reasonable time from the time of the last promise.[4] What is a reasonable time must be determined by you after taking into consideration all the facts and circumstances of this case.

Market value means the fair value as between one who desires but is not compelled to purchase, and one who is willing but is not compelled to sell, not what could be obtained for like oil under peculiar circumstances, when a price greater than its fair value could be obtained, nor a speculative value, nor a value obtained from the necessity of the seller to sell or the purchaser to buy, but its value at a sale which a prudent owner would make if he had the power of election as to time and terms.[5] In determining market value you are not restricted to the evidence of actual sales, but you are at liberty to consider in this connection accredited price current lists and market reports, if any, published in trade journals which have been admitted in evidence, if you believe from the evidence such trade journals to be trustworthy.[6] The market price must be determined as of the place of delivery provided the goods have a market price at such place.[7] If there is no market price at the place of delivery the price at the nearest available market, where the same or like goods could be procured should be taken.[8] In the latter instance the difference in cost of transportation should be adjusted. In the event that you find no direct evidence as to the market value on a day or days upon which such value is to be ascertained by you, the price at which a sale of like oil was made within a reasonable time of the day or days upon which the market price is to be ascertained may be considered by you as some evidence of the market price on such day or days. Whether or not the plaintiff is entitled by way of additional damages to interest at the legal rate on the amount of damages, if any, found by you to be due the plaintiff, is for your determination, after taking into consideration all the circumstances of the case.

[4] After you shall have determined the aggregate of the damages, if any, to which the plaintiff is entitled under the evidence and the instructions already given you, you will next consider whether those damages should be reduced by reason of the matters offered in evidence under the defendant's notice of recoupment. By its notice of recoupment the defendant alleges that at the time of the execution of the contract in question the plaintiff was informed that the defendant made the contract for the purpose of marketing the flush production of oil from its wells, that is, the oil flowing from the wells while impelled by pressure of natural gas or other natural forces; that the plaintiff was then informed that if it did not take from the defendant the oil referred to in the contract as thereby required the defendant would be damaged by inability to mine, produce, and dispose of the flush production oil, whereby said oil and the value thereof would be entirely lost to the defendant; that by reason of the failure of the plaintiff to accept and receive the oil covered by the contract the defendant's wells were injured, and the defendant lost, by inability to market said oil and by seepage from defendant's wells into wells of adjoining owners, a large quantity of oil.

If you find that the plaintiff did not break the contract, or that the contract was broken only by the plaintiff, or if you find that the defendant did not give to the plaintiff the notice that it alleges in the recoupment that it gave, then the notice of recoupment is of no value in this case, and may be wholly disregarded by you; but, if you find that the contract was broken by both the plaintiff and the defendant, then you will determine whether as a result of such breach or breaches on the part of the plaintiff the defendant's wells were injured, and, if so, to what extent, and whether the defendant lost

---

[4] Hickman v. Haynes, L. R. 10 C. P. 607; Ogle v. Lord Vane, L. R. 2 Q. B. 275, in error 2 Q. B. 272; In re Llansmaler Tin Plate Co., L. R. 16 Eq. 155; Tyres v. Rosedale Iron Co., L. R. 8 Ex. 305.

[5] Madisonville, H. & E. R. Co. v. Ross, 13 L. R. 2 N. S. 430.

[6] Virginia v. West Virginia, 238 U. S. 202. 212, 35 Sup. Ct. 795, 59 L. Ed. 1272.

[7] 35 Cyc. 638.

[8] Grand Tower Min., etc., Co. v. Phillips, 23 Wall. 471, 23 L. Ed. 71.

any oil by inability to market such oil and by seepage from defendant's wells into wells of adjoining owners. If you so find, you must ascertain the amount of oil the defendant lost in this manner solely by reason of plaintiff's breach. In ascertaining the amount of oil so lost by the defendant, if any, you may not charge the plaintiff with losses to the defendant of oil by seepage or otherwise, which the defendant may have sustained by reason of the increase in the number of wells in the northwest extension of the Burkburnett district, or in the activity of the new wells, or in the greater activity of the wells on the adjoining properties at the time of the execution of the contract, if there was any increased activity in such wells.

Nor may you charge the plaintiff with losses of oil, if any, sustained by the defendant by reason of the cessation of the flush production of oil in the Burkburnett district, if the breach or breaches of the plaintiff had no appreciable effect in bringing about such cessation. If, after taking into consideration the foregoing matters and the other evidence in the case, you find that, due solely to the default of plaintiff, the wells of the defendant were injured, or the defendant lost certain oil from the so-called subterranean reservoir, by drainage from its lands to wells of adjoining lands, which, but for the default, it would itself have mined and saved, the defendant would be entitled to have the damages of the plaintiff, if any, reduced by you by the amount to which the defendant was injured thereby. The amount of defendant's damages in such event would be ascertained by multiplying the number of barrels of oil so lost, by the contract price less the cost of production, if any, with interest thereon should you determine to allow such interest by way of additional damage. If you find that the defendant sustained damage as alleged in its notice of recoupment, the result obtained by subtracting the aggregate of the damages so sustained by the defendant from the aggregate of the damages so sustained by the plaintiff should be the amount of your verdict for the plaintiff, in the event that the damages sustained by the plaintiff exceed the damages sustained by the defendant; but should you find from the evidence that no breaches of the contract were made by the defendant, or if you find that the damages sustained by the defendant equal or exceed those sustained by the plaintiff, your verdict should be for the defendant.[9] If, on the other hand, you find that the contract was broken in whole or in part by the defendant, and not broken in whole or in part by the plaintiff, your verdict should be for the plaintiff, and for the full amount at which you may ascertain its damages under the evidence and the principles of law heretofore stated to you.

You have heard the testimony. It is fresh in your recollection, and I shall not comment upon or summarize it. The burden of proving the allegations and matters essential to sustain plaintiff's claim to damages as to any installment or installments of oil rests upon the plaintiff, while the burden of proving the matters essential to sustain defendant's claim to damages by way of recoupment as set up in its notice of recoupment rests upon the defendant.

You are the sole judges of the facts, and of the weight and value of the testimony of the witnesses, aand where there is conflict in the evidence you are first to reconcile that conflict, if you can. If you cannot, you are to give credit to those witnesses whom, from all the circumstances—the appearance of the witnesses, their apparent fairness, their manner on the stand, their ability to testify, and their knowledge of the things to which they testify—you deem most worthy of credit, and reject that part of the testimony which you deem to be not worthy of credit.

Your verdict should be based upon the preponderance or greater weight of the evidence, and not necessarily upon the greater number of witnesses.

The court has been requested to give you instructions on a number of points of law in the language employed by counsel. The charge of the court embraces in substance all of the propositions suggested by counsel, in so far as those propositions are, in my opinion, properly applicable to the case.

---

[9] 24 R. C. L. 884;  25 A. & E. (2d Ed.) 561.

Louis Marshall, of New York City, and Caleb S. Layton, of Wilmington, Del., for plaintiff in error.

Rowland M. Connor, of Detroit, Mich., and William S. Hilles, of Wilmington, Del., for defendant in error.

Before WOOLLEY and DAVIS, Circuit Judges, and ORR, District Judge.

DAVIS, Circuit Judge. The plaintiff below, a Michigan corporation, brought suit against the defendant below, a Delaware corporation, to recover damages for breach of a contract dated October 22, 1919, wherein defendant agreed to sell and plaintiff to purchase 100,000 barrels of crude oil in approximately equal daily quantities during the period of 90 days beginning November 1, 1919, and ending January 28, 1920, at $1.60 per barrel, "time being the essence" of the contract. The plaintiff was to make all necessary arrangements to receive the oil at the wells of the seller during the period, and "to use their utmost endeavor to prevent delay." The defendant agreed "to deliver all oil promptly," and the plaintiff to accept it promptly and without delay, but was not to be "liable for not accepting same when inability to do so is the result of fires, strikes, or other causes beyond its reasonable control."

The oil was to be delivered at the defendant's wells to the Empire Pipe Line Company, an independent common carrier, which had to lay its pipes a distance of about two miles, and connect them with the wells of the defendant company. The plaintiff made arrangements with the Pipe Line Company on October 22, 1919, the same day the agreement was executed, to lay the pipes and make connections with the wells of the defendant company. The Pipe Line Company, however, did not connect its pipes with the wells until on or about November 7 or 8, 1919, although urged to do so.

In November, 1919, defendant delivered 803.84 and in December 1,223.92 barrels, making a total of 2,027.76 barrels. On or about January 31, 1920, defendant definitely and orally informed plaintiff that it would not make "any further deliveries on the contract." From the time the pipe connections were made until January 31st, the plaintiff alleges it constantly urged the defendant to make deliveries in accordance with the terms of the contract, and suggests as a reason for its failure and refusal to do so that oil advanced in price almost daily from about the contract price, of $1.60, to $3 per barrel on January 6, 1920, and continued to advance until on February 27, 1920, it was $3.25, and in March following $3.50, per barrel. On the other hand, the defendant alleges that it was ready and willing to deliver, but the plaintiff could or would not receive, though urged to do so, and so on or about December 6, 1919, it repudiated the contract, but did as a mere matter of accommodation deliver 803.40 barrels afterward. It contends that it was anxious to deliver, because it was daily losing oil through sceppage from its lands into adjoining lands, from which oil was being abstracted. It therefore filed a recoupment in damages against the plaintiff.

The defendant seems to rely mainly on its contention that the allegations in the declaration as to diverse citizenship of the corporations were insufficient to confer jurisdiction on a federal court. This point was stressed in the brief, and, notwithstanding that it was not raised below, it will be fully considered here, because it is a jurisdictional question. The plaintiff alleged in the introductory paragraph of the declaration that it was "a corporation existing under the laws of the state of Michigan," and the defendant was "a corporation existing under the laws of the state of Delaware." It further appears in each of the three counts that the plaintiff is "a corporation existing under and by virtue of the laws of the state of Michigan," and the defendant is "a corporation existing under and by virtue of the laws of the state of Delaware."

[5-7] These allegations are insufficient, defendant says, because "a corporation may exist under the laws of several states" at the same time. The averment in a formal pleading that a corporation exists under and by virtue of the laws of a state, by legal intendment, means that it legally exists. A corporation, the legal entity or person which exists by force of law, can have no existence beyond the limits of the state which creates it and endues it with faculties and powers. Ohio & Mississippi Railroad Co. v. Wheeler, 66 U. S. (1 Black) 286, 17 L. Ed. 130. It is a citizen of the state under whose laws it was created, and is deemed a person, but may do only what is authorized by its charter, while natural persons may do whatever is not forbidden by law. Railroad Co. v. Harris, 79 U. S. (12 Wall.) 65, 81, 20 L. Ed. 354. A corporation created in one state may not migrate from state to state, but may carry on business and exercise its charter powers in another state by complying with the laws of that state, without becoming a citizen thereof.

[8] Authority of a corporation to carry on business in another state is most frequently given by general statutes applicable alike to all foreign corporations, but sometimes a special enabling statute is passed for a particular corporation. This statute may confer practically the same powers upon a foreign corporation as it possesses in its home state. If the purpose of the Legislature in passing the statute for a particular corporation is to make the corporation of another state its own, it thereby creates a new corporation with a new existence. Each corporation, it may be, with the same name and powers in each state, exists independently under and by virtue of the laws of its own state. This results in two separate, legal entities, alike in name and powers, but each existing under the laws of its own state quoad hoc any property within its territorial jurisdiction. If the purpose is not to create, but simply to enable, permit, and control, the corporation is not a citizen of the enabling state, but remains a foreign corporation. Ohio & Mississippi Railroad Co. v. Wheeler, supra; Railroad Co. v. Alabama, 107 U. S. 581, 584, 2 Sup. Ct. 432, 27 L. Ed. 518.

[9] The creation of a corporation is the beginning of its existence, but for the purpose of jurisdiction in a federal court on the ground of diverse citizenship, the beginning of existence is not enough. Continuance is necessary. The full allegation, in pleading the citizenship of

a corporation, is that it is a corporation created and existing under the laws of the state in question. This is illustrated in the case of the Sun Printing & Publishing Association v. Edwards, 194 U. S. 377, 24 Sup. Ct. 696, 48 L. Ed. 1027. It was alleged in the declaration that the association was a corporation "duly organized and existing under the laws of New York." The averment, however, is often made and held sufficient that the corporation was simply "created"—a past act —under the laws of the state, but the presumption and legal intendment are that the corporation was not only created, but continues to exist, under the laws of the state. Likewise the statement that a corporation "exists" under and by virtue of the laws of a state intends to import the fact that it not only exists, but also began its existence—was created—under and by virtue of the laws of that state, and so, in legal intendment, "created by, organized under, or existing under" the laws of a state are equivalent phrases. Mathieson Alkali Works v. Mathieson, 150 Fed. 241, 80 C. C. A. 129. "If the declaration sets forth facts from which the citizenship of the parties may be presumed or legally inferred, it is sufficient." Marshall v. Baltimore & Ohio Railroad Co., 57 U. S. (16 How.) 314, 14 L. Ed. 953.

[10] Where jurisdiction in a federal court depends upon diverse citizenship, the whole record may be looked to for the purpose of curing a defective averment of citizenship, and if the requisite citizenship is anywhere expressly alleged, or facts stated which in legal intendment constitute such averment, it is sufficient. Sun Printing & Publishing Association v. Edwards, supra.

[11] At the beginning of the trial the following admission was made:

"Mr. Hilles: If your honor please, the plaintiff and defendant, respectively, are willing to admit the corporate existence of the parties as alleged in the declaration and their citizenship.

"The Court: Is it so understood, Mr. Layton?

"Mr. Layton: Yes, sir."

This was, in our opinion, an intended admission that the parties were corporations and citizens created and existing under the laws of the respective states mentioned in the declaration. The truth of their citizenship as such has been nowhere challenged, and if the question of the sufficiency of the averment had been raised in the District Court, an amendment could and doubtless would have been made. We therefore conclude that on this branch of the case there is nothing to disturb the judgment of the District Court.

[12] The other assignments refer to alleged errors in charging the jury and in refusing to charge requests. At the close of the charge the judge stated that:

"The charge of the court embraces in substance all of the propositions suggested by counsel, in so far as those propositions are, in my opinion, properly applicable to the case."

Counsel for defendant neither noted an exception to the refusal to charge requests, nor did he note an exception to any particular part of the charge, but simply noted an "exception to the charge of the court." This was a general exception, which is contrary to rule 10 of this court

(224 Fed. vii, 137 C. C. A. vii). It provides that the party excepting shall state distinctly and separately the several matters in the charge to which he excepts, and only such matters shall be included in the bill of exceptions. Experience has confirmed the wisdom of this rule, and assignments of error not based upon such exceptions, this court has held, will not be considered. Barnes & Tucker Coal Co. v. Vozar, 227 Fed. 25, 141 C. C. A. 579; Pennsylvania Railroad Co. v. Repine, 272 Fed. 898.

[13] In this case, however, the learned trial judge in a most carefully prepared and comprehensive charge clearly analyzed the facts, fully stated the issues, and correctly expounded the law. The verdict, of the jury settles the facts, and the judgment of the District Court is affirmed.