## RIEGLE v STATE

Ohio Appeals, 6th Dist, Sandusky Co

No 263.  Decided March 20, 1933

Boyd, Brooks & Wickham, Cleveland, and Charles L. Foster, Bradner, for plaintiff in error.

Raymond E. Ladd, Pros. Atty., Toledo, for defendant in error.

RICHARDS, J.

The section of the statute cited is the penal section of the banking laws, but it is manifest that the language of the indictment relating to a claimed excessive investment in the bonds of The Hughes Dairy Company has reference to §710-121, GC, which provides in substance that not more than 20% of the capital and surplus of a bank shall be invested in any one stock or security, but no penal clause is attached to the latter section.

A demurrer was filed to the indictment, the defendant contending that a violation of §710-121 GC was not a wilful misapplication under the terms of the penal section, §710-172 GC.

We have given the language of the indictment a careful examination, and conclude that the demurrer was properly overruled. The mere investment of more than 20% of the capital and surplus of the bank in any one stock or security would not, of course, constitute a penal offense, but the indictment charges far more than that. It has, in fact, a double aspect, namely: the wilful and unlawful purchase by himself as president of the $1,000.00 bond from himself for the bank with the intent to defraud the bank, and the further charge that as president of the bank, knowing that 20% was unlawfully invested in the bonds of The Hughes Dairy Company, he unlawfully and wilfully and with intent to defraud, invested funds of the bank in the bonds of said company. The conduct which is condemned as criminal in §710-172 GC, is not less criminal because it involves an investment of more than 20% of the bank's capital and surplus as prohibited by §710-121, GC.

The evidence discloses that the plaintiff in error, prior to the transaction of December 12, 1925, had been for many years a director and president of the bank and had served as its attorney, and had for a long time been a director and attorney for The Hughes Dairy Company and was undoubtedly familiar with the financial affairs of the bank and of the dairy company. He ceased to be president of the bank in August, 1926, and disposed of the stock which he had held. Some three or four years later the bank was taken over by the State Superintendent of Banks for liquidation. The dairy company was a customer of the bank and had at various times been largely indebted to it. Shortly before the date named the dairy company had arranged to float a new loan which involved taking

up its existing bonded indebtedness and executing a mortgage and bonds in the amount of $125,000.00. The bank was the owner of bonds of the dairy company and the plaintiff in error owned bonds of the same issue. The evidence shows that the bank on October 27, 1925 held bonds of the company of the face value of $6,000.00, and that the company was indebted to it on promissory notes in the amount of $35,-000.00. On that date, by agreement with the dairy company, the bank cancelled its promissory notes against that company of $36,000.00, and accepted in payment thereof bonds of said company of the face value of $39,000.00. On the same day $3,000.00 of bonds of that company held by the bank were withdrawn from the bank, but under what circumstances is not disclosed by the record, nor does the record show how much, if anything, the bank paid for $3,000.00 of bonds against the dairy company which it had obtained on October 26, 1925. On December 2nd the bank became the owner of two more bonds of said company, each of $1,000.00 face value. No further changes occurred until December 12, 1925, and it would therefore appear that at the beginning of business on that date the bank was the owner of $44,000.00 face value of the bonds of the dairy company and that these bonds had not cost the bank to exceed $41,000.00. On that date the plaintiff in error sold the bank one bond of the dairy company of the face value of $1,000.00 for the price of $1,000.00 and the amount was deposited in his individual account in the bank and thereafter checked out by him. This transaction made the bank, at the close of business on that day, the owner of $45,000.00 face value of the bonds, but before there could be a violation of the provisions of §710-121, GC, it must appear that more than 20% of the capital and surplus of the bank was invested in these bonds, and the burden rested on the state to show that fact. While the bank in fact owned $45,000.00 face value of the bonds, yet as we read the record it had not invested more than $42,000.00 in acquiring them. The capital and surplus of the bank being at that time $210,000.00, it had not violated the terms of the section just cited by the fact of investing $42,000.00 in these bonds.

The indictment would have been just as good if no reference had been made in it to the claimed excessive investment of funds of the bank in the bonds of the dairy company, for there would still be left in the indictment the charge that the plaintiff in error, as president of the bank, knowingly and unlawfully purchased from himself on behalf of the bank a bond of the dairy company for $1,000.00, the same having no market value, with intent to defraud the bank. If the indictment had contained no other charge than just mentioned, the evidence relating to the large purchases of bonds of the dairy company by the bank would have been competent as bearing on the intent of Riegle. In view of the state of the record showing that the bank had not invested any more than $42,000.00 in the bonds of the dairy company, the extended charge of the court with reference thereto must have been misleadig to the jury.

Complaint is made about the charge of the court on the subject of intent. In charging on that subject the court used the following language:

"Every sane man is presumed to know the consequences of his voluntary acts and when he acts he must have intended to act and to so act in the light of the consequences that follow his acts. And when the act is an illegal act and he did it knowingly, he must have intended to do an illegal act. The intent may be presumed from the doing of the wrongful, fraudulent or illegal act and in this case, if you find that the defendant as an officer of the bank placed or caused to be placed property of his own which he knew to be worthless or of little value among the assets of the bank at its face value and had that face value placed to his own personal account on the books of the bank, from such finding of fact you must necessarily infer that the intent with which he did that act was to defraud or injure the bank, but this inference or presumption is not necessarily conclusive. There may be other evidence which may satisfy the jury that there was no such intent. The question of intent is to be determined by the facts and circumstances and the surroundings at the time of the transaction, all as shown by the evidence.

If the defendant wilfully misapplied the funds or money of the bank as charged, whereby as the necessary, natural or legitimate consequences its capital was reduced or its ability to meet the obligations or engagements or continue its business was lessened, the intent to injure or defraud the bank may be presumed, but of course such presumption may be rebutted by other evidence."

We think this is stating the matter too

strongly against the defendant and it is not a presumption of law to be drawn by the court. It is quite true that a guilty intent may be inferred from the act, but this is an inference of fact which may or may not be drawn by a jury and it is going quite too far to say that the jury must necessarily infer that the intent was to defraud.

Hibbard v United States, 172 Fed., 67.

True, the court informed the jury that the inference or presumption was not necessarily conclusive, but the court follows that statement with the instruction that

"There may be other evidence which may satisfy the jury that there was no such intent."

The instruction not only cast the burden on the defendant to remove the presumption of guilty intent, but required that the evidence offered to remove it should be such as to "satisfy" the jury that there was no such intent. In a case of this character, intent to defraud is one of the essential elements of the crime to be proved by the state beyond a reasonable doubt and if and when the state has made out a case against a defendant the only duty resting on him is to offer, if he can, sufficient evidence to create a reasonable doubt of his guilt. He is not required to satisfy the jury that there was no such intent, but if all the evidence in the case, including that on the subject of intent to defraud, created in the minds of the jurors a reasonable doubt of the material facts necessary to establish every element of the crime, it was their duty to return a verdict of not guilty. This rule has been laid down even in cases where an alibi is relied on, although an alibi is a defense to be asserted by the defendant. The instruction as given in effect told the jury that the defendant was moved by an intent to deceive if some one was deceived as a result of his conduct.

In the next sentence in the charge, after that above quoted, the trial judge said to the jury:

"A presumption arises, in the absence of evidence to the contrary, that a president of a bank has knowledge of its doings and transactions whenever by ordinary diligence he could have acquired the same, and whether or not such presumption is satisfactorily overcome, is for you to say from all the evidence, if it arose here."

Here again the charge imposes on the defendant the burden to "satisfactorily" overcome a presumption, while under the law he need only introduce sufficient evidence to create a reasonable doubt as to his guilt. The instruction advises the jury that the presumption applies in a criminal case even to acts of which the defendant had no knowledge, and might make a criminal of him for mere failure to exercise ordinary care. The instruction imposes the same liability on the president of a bank who can only give a part of his time to the details of its business as on one who devotes his entire time to the affairs of the bank.

Much uncertainty exists as to the value of the bonds issued by The Hughes Dairy Company. The indictment charges that the bonds had no market value. Complaint is made that on the subject of value the indictment charges only that the bonds of The Hughes Dairy Company had no market value and that no proof was introduced as to their market value. On this subject the trial judge charged the jury that market value was the price property would bring in a fair market after fair and reasonable efforts to find a purchaser who would give the highest price for it; that it was the price that could have been obtained in the open market on fair competition. We find no prejudicial error on this subject. §13449-5, GC. The company had consistently lost money in its business for a long period of time, resulting in the appointment of a receiver some considerable time after the transaction charged in the indictment and a sale of the plant by the receiver. Apparently the bonds were declining in value, although various sales of them were made. The jury may well have found, under the evidence, that on December 12, 1925, the bond which Riegle sold to the bank was worth much less than its face value of $1,000.00. It is claimed that the bond was afterwards disposed of by the bank for its face value and therefore the defendant could not properly have been convicted. Even if the fact be established, we do not think the conclusion necessarily follows. If the bond was worth, when sold to the bank, substantially less than the amount for which it was so sold and the sale was made with the intention of wilfully and knowingly defrauding the bank, the defendant might be found guilty, even though the bank, some time after it became the owner, was able to dispose of the bond at its face value.

Error is assigned to the admission of certain official written reports make by a state

bank examiner. It is held in State v Salmon, 216 Mo., 466, 530, that such reports are admissible in the prosecution of an officer of a bank where insolvency of the bank is involved, as bank examiners are state officials and required to make reports of their examinations. See **City of Bucyrus v State Department of Health, 120 Oh St, 426.** The evidence shows that the later reports were attested by Riegle and submitted to the Board of Directors of the bank when he was present and they were clearly admissible. The first report, the one signed on April 10, 1925, was not attested by Riegle and does not appear to have been seen by him, but between the date of that report and the date laid in the indictment the indebtedness of The Hughes Dairy Company to the bank had so radically changed that the report itself seems to have little bearing on the issues and its receipt in evidence could in no sense be prejudicial.

However, for the errors mentioned, the judgment must be reversed and the cause remanded for a new trial.

WILLIAMS and LLOYD, JJ, concur.