Fred R. **FEHLHABER** and Frank E. Power, et al., Plaintiffs,

v.

**INDIAN TRAILS, INC.,** Defendant,

v.

Frank **MORRISEY** et al., Third-Party Defendants.

Civ. A. Nos. 2829, 2846.

United States District Court
D. Delaware.

May 23, 1968.

---

Arthur F. DiSabatino, Killoran & Van Brunt, Wilmington, Del., Richard A. Bausher, Reading, Pa., for plaintiffs.

William T. Lynam, Wilson & Lynam, Wilmington, Del., for defendants.

LAYTON, District Judge.

## OPINION

This is a consolidated action by Plaintiffs Fehlhaber, Barry, Power and Derrico against Defendant Indian Trails, Inc., a Michigan corporation, and Third Party Defendants, Frank Morrisey and Francis C. Morrisey d/b/a Lawrence Farms Stables and James A. Flood, Jr., in which plaintiffs seek to recover damages to certain race horses owned by them which damages resulted from a collision on the Delaware Memorial Bridge on April 26, 1963. This opinion constitutes the Court's findings of fact and conclusions of law pursuant to Rule 52 F.R.Civ.P.

## FINDINGS OF FACT

(1) On April 26, 1963, the weather was clear and the roadbed of the Delaware Memorial Bridge dry.

(2) The southerly two lanes of this bridge carry vehicular traffic eastbound from Delaware into New Jersey.

(3) A portion of the right hand lane of the two southerly, eastbound lanes was under repair.

(4) This portion under repair started on the up-slope of the outside, right hand lane and extended up to the towers of the bridge.

(5) Prior to the beginning of the span itself, there were warning signs indicating construction ahead.

(6) Short of the construction work, traffic was funneled away from the southerly, on to the northerly, east bound

lane by way of cones extending gradually across the southerly lane to the southerly extreme of the northerly eastbound lane.

(7) The speed limit from the beginning of the cones through the construction area was 25 m. p. h.

(8) The traffic was quite heavy with the result that the cars funneling from the southerly into the northerly lane caused a grinding halt in the eastbound traffic.

(9) A car carrier ahead of Third Party Defendants' horse van came to a stop in the northerly eastbound lane.

(10) A horse van owned by Third Party Defendants, the Morriseys, and operated by Third Party Defendant, Flood, funneled sharply into the left lane and applied its brakes suddenly to avoid hitting the car carrier from the rear.

(11) Since defendant bus driver admits the car carrier was directly ahead of the horse van, which was in the right hand lane, then the bus driver, in the left lane, must have had a clear view of the car carrier coming to a stop behind a long line of stopped vehicles in his (bus driver's) lane; yet the bus driver apparently saw nothing to warn him of danger until the horse van began turning left ahead of him and coming to a sudden stop.

(12) Defendant's bus likewise tried to make an emergency stop but because of its excessive speed skidded 83 ft. uphill into the rear of the horse van.

(13) A moment prior to entering the coned area, or construction area, the defendant's bus driver admitted proceeding at a speed up to 40 m. p. h.

(14) The collision forced the horse van into the car carrier.

(15) The horse van had either come to a full stop or was practically stopped at the moment defendant's bus hit it from behind, forcing it into the rear of the car carrier.

(16) The front of the defendant's bus was crumpled and the driver pinned in his seat and injured. Nine passengers suffered relatively minor injuries.

(17) All the horses in the van were shaken up and injured in varying degrees.

(18) Defendant's bus driver failed to keep a proper lookout.

(19) The speed of defendant's bus was greater than was reasonable or prudent under the conditions then prevailing, in violation of Title 21 Del.C. § 4125(a) and (b).

(20) Defendant's driver was negligent.

(21) This negligence was the negligence of the defendant.

(22) This negligence was a proximate cause of the accident.

## OWNERSHIP OF THE HORSES

(23) Plaintiff Fehlhaber was the sole owner of Gaelic Prince. Plaintiff Power was the sole owner of Prince Dion and a part owner of Star Grad and Towson Gal. Plaintiffs Derrico and Barry were each part owners of Star Grad and Towson Gal.

## INJURIES TO HORSES IN VAN

(24) *Star Grad* was in excellent physical condition when placed on the van in Laurel, Maryland, prior to the accident. After the accident, his back muscles were rigid and tender, and he had a stilted gait. There was muscle injury to the lumbar muscle group. He was given antibiotics and stall confinement was recommended. He never regained his top form and was finally raced in a claiming race and was claimed. The accident was the proximate cause of the injuries.

(25) *Prince Dion* was in excellent condition when boarding the van. After the accident, he was suffering from cuts and stiffness. He walked like a man with "pebbles in his shoes" and never again regained his racing form. The accident was the proximate cause of the injuries.

(26) *Towson Gal* was in fine physical condition when placed aboard the horse van in Laurel, Md. After the accident, there was evidence of sensitivity and pain over back and hip. Her gait was obviously bad. She suffered from an atrophy of the gluteal muscles. She never regained her normal racing form. These injuries were a direct result of the accident.

**(27)** *Gaelic Prince* was in excellent physical condition when placed aboard van. He received a laceration in the tendon of the left foreleg. There was swelling and tenderness. He was slightly lame. Later, while the laceration healed, there remained a noticeable thickening in the left foreleg and there was a permanent swelling the size of a silver dollar over the area of the tendon. Antibiotics were given and heat treatment. He had what is referred to as a bowed or "hot" tendon. Later, the tendon was "blistered" but he never regained form. These injuries were the direct result of the accident.

### VALUATION [1]

There is a sharp diversity among the experts as to the value of two of the horses involved in this case. They are Gaelic Prince and Towson Gal. The opinion of plaintiffs' experts seems to be acceptable as to the other two horses, Prince Dion and Star Grad. In any event, defendants did not contest the before-and-after values placed by plaintiffs' experts on these two latter horses.

As to valuation generally, we are in a field where the experts concede that opinions vary widely. Thus, according to plaintiffs' experts, Gaelic Prince was worth not less than $100,000 immediately before the accident while defendants' expert takes the position he could have been worth no more than $50,000 at that time —a 100% spread. Similarly, according to plaintiffs' experts, the value of Towson Gal on April 26, 1963, could have been no less than $35,000 while defendants' expert testified she could have been worth no more than $25,000.

The Court is thus presented with a factual situation where the record is devoid of testimony that would support a valuation, in the case of Gaelic Prince, of any figure between $50,001 and $99,999 and, in the case of Towson Gal, of any figure between $25,001 and $34,999.

### THE EXPERTS [2]

**(28)** Plaintiffs' experts were, with two exceptions, financially interested in the horses injured. As stated earlier, plaintiff Power was the sole owner of Prince Dion, and a co-owner with plaintiff Barry of Star Grad and Towson Gal. Both Barry and Power necessarily were bound to feel that Towson Gal was a valuable horse. This is perfectly natural. Plaintiff Fehlhaber (herein "plaintiff") was the sole owner of Gaelic Prince. Barry, as Fehlhaber's agent, had arranged the purchase of Gaelic Prince and was employed by Mr. Fehlhaber as his trainer. To a certain extent, it would seem to me that Barry's association with the plaintiff would be likely to make him sympathetically inclined towards plaintiff's strongly expressed view that Gaelic Prince was an extremely valuable horse. To some extent, also, this would be true of Mr. Luro who for a time was employed by plaintiff to assess Gaelic Prince's condition and determine whether he could be salvaged as a race horse. Dr. O'Keefe, then, was the only apparently completely impartial witness for plaintiff. He is thoroughly knowledgeable in the field, a veterinarian, a breeder, a buyer and seller of horses and a frequent attendant at auction sales. It is only fair to say, however, that he placed extremely high values on Gaelic Prince and Towson Gal, higher even than Mr. Barry.

Despite Dr. O'Keefe's position of relative independence vis-a-vis the plaintiff and his other experts, the overall weight of his testimony was substantially diminished by several factors:

(a) As did others among plaintiff's witnesses, Dr. O'Keefe in part based his opinion of Gaelic Prince's value on the performance of other horses, long after this accident, against whom Gaelic Prince raced prior to the accident. The Delaware rule holds that damage to personal property is the difference between the value of that property immediately

---

**1.** This general statement under the heading "Valuation" is not intended to be a finding of fact.

**2.** The statements in memorandum form under the heading "EXPERTS" shall be taken as a comprehensive factual finding under heading (28).

before and immediately after the accident. Yet, Dr. O'Keefe was comparing Gaelic Prince's performance against certain horses prior to the date of the accident, April 23, 1963, with the reputation these same horses had acquired several years later. The urge to do this is almost irresistible but it gives the witness the advantage of a hindsight to which he is not entitled. I do not hold this type of evidence inadmissible but feel that it must be weighed in the light of what has just been said.

(b) Dr. O'Keefe apparently placed substantial emphasis on the fact that Gaelic Prince had been nominated for the Preakness. Nomination by the owner of a horse for one of the great stake races represents no more than a hope or expectation that the particular horse has a great potential. In this case, a relatively small $100 pre-entry fee was paid for Gaelic Prince's entry in the Preakness, to be followed by a more substantial fee just before the event. The minimal weight to be accorded "nomination" as a basis for value is further illustrated by the fact that Gaelic Prince's owner nominated him for entry in three other big stake races in 1962, *in none of which he subsequently ran.*[3]

(c) Dr. O'Keefe, prior to the trial, had told the plaintiff that the lowest price he would expect Gaelic Prince to bring at public auction was $50,000, which agrees with the figure that defendants' expert, Finney, put on his horse. Of course, the "lowest figure" implies that Dr. O'Keefe felt Gaelic Prince was worth more than $50,000, but this valuation is not easily reconciled with his minimum valuation of $100,000 at trial (a 100% increase), and still less so with his maximum valuation of $150,000 at trial, being 200% in excess of his lowest pretrial valuation.

(d) As a corollary, the extremely wide variation between $100,000 and $150,000 in Dr. O'Keefe's valuation of Gaelic Prince at trial detracts from the value of his testimony insofar as concerns a judge or jury in attempting to arrive at a reasonable verdict.

(e) Finally, all of plaintiff's witnesses based their valuation of Gaelic Prince upon private sales. The many arguments in support of a valuation by public auction standards were never mentioned. And even after defendants' expert, Mr. Finney, had given his valuation based upon public auction standards, none of plaintiff's witnesses were recalled to rebut the persuasive arguments advanced by Mr. Finney in support of a public auction approach to valuation.

It is of course conceivable, and Mr. Finney conceded the possibility, that an unsophisticated buyer at private sale under the spell of Barry's eloquence and influenced by the horse's fine conformation and his winning of the stake race of November 9, 1962, might have been emotionally swayed into paying a figure higher than was indicated by the cold, hard facts of his erratic racing record. But it is very difficult to justify a valuation by such nebulous standards.

On the other hand, defendants' expert, Mr. Finney, occupies a unique position in the field because he is engaged in the business of buying and selling horses for clients at private sale and also in selling at public auction. He is the Vice President and General Manager of Fasig-Tipton Co., this country's oldest and largest thoroughbred auction sales and service organization. Each year, under Mr. Finney's overall direction, Fasig-Tipton sells between 3000 and 3500 thoroughbreds at public auction at 25 sales held in seven locations in the United States and Canada—for instance, Miami and Saratoga. The gross value of these public auctions is about $25 million annually. Also, Fasig-Tipton under Mr. Finney's overall supervision, buys and sells at private sale horses with a gross value of one to two million dollars. Each year Mr. Finney goes to England to buy brood mares and foals on account of cli-

3. Arlington-Washington Futurity; Champagne Stakes; Garden State Stakes.

ents. An extract from the record throws light on Mr. Finney's activities:

"Well, I was in the office (Fasig-Tipton) until the 10th (January) and I drove to Virginia and made a deal there on some horses that were to go to Saratoga. I drove from there to Miami, set up the first sales, then flew to California. We sold there (conducted auctions) on the 14th and 15th. We sold 400 head for about $800,000. Then I flew back to Miami, and the last four nights we sold 213 head for $3,100,000 in Miami. I go from there to Belmont Park to look at a horse in the morning and back to Miami tomorrow afternoon. We sell there * * *."

The manner in which Fasig-Tipton conducts its sales is again best illustrated by the record:

Finney: "Let me say that a sale such as the one I am referring to at Belmont Park, of which we run four each year, two in the Spring and two in the Fall, first the sale is advertised starting a month to six weeks in advance in all the national trade publications. Secondly, a catalogue is printed, approximately 4500 copies, the catalogue containing all the pedigree particulars of the animal, all the racing, and the past performance racing up to that date. This is sent to a mailing list of known thoroughbred buyers that number approximately 2000. It is distributed in bulk at all race tracks * * *. This distribution is free distribution and the information is thereby made available to practically everyone who 'would have a bona fide interest in these horses and there is no admission charge to the auction. *I would say that it is about as pure a public test of the market value of an animal as you could get.*'" (Emphasis added.)

Mr. Finney had no personal interest in any of the horses involved and, so far as is known, in the defendants for whom he testified. A careful appraisal of his testimony from the stand convinces me that:

"One of the lovely things about public auctions in establishing the value of an animal is that, assuming the seller is willing to sell at whatever value the public puts on the horse, you are not just dealing in two opinions (single seller, a single buyer) as you are at private sale; you are dealing in the collective opinion of an industry because everyone has been exposed to the animal. * * * What the public is willing to pay for it that day is the best gauge of its true market value." *

## GAELIC PRINCE

(29) Gaelic Prince had a good, but not great, pedigree, fine conformation and a markedly erratic racing record. In fact, he won only two races. His earnings record was negligible (about $6500) and he was insured for only $20,000. While not of itself significant, no effort was made to explain why, if he were worth $100,-000–$150,000, so little insurance was carried on him. All experts seemed to agree that the most important test of a racing horse's worth is its racing record. All agreed that many horses, like some athletes, on one or two days of their careers are capable of greatness. But it is consistency that counts heavily and Gaelic Prince lacked this important attribute, finishing, for instance, first on November 9, 1962, against an excellent field and last on December 5th, his next race. He had moments of brilliance by Finney summed up his value as follows:

"Simply because he is one of a thousand horses in this crop who once showed promise but didn't quite get the job done, and even though the owner or the trainer might feel, or someone who was close to the horse might feel that this horse was potentially a great one, nonetheless you could not sell that on the open market to the public. There is not enough depth to his form. Essentially what happens is, you look at a horse here and you have got a horse that made a total of about a dozen lifetime starts. He won a couple of races. He ran in one stake, and he ran last. There is not much there

to get the public enthused about breeding the horse."[4]

There were moments during this horse's career (for instance, just after winning the race at Garden State on November 9, 1962) when expert opinion as to his value might have been quite high but, as of April 25, 1963, measured in terms of his disappointingly erratic record, he appears to have been a horse with a fair past but a relatively uncertain future.

### TOWSON GAL

(30) Towson Gal was a fine, hard-working, consistently winning filly which any owner would be glad to have in his stable. She was not a brilliant horse, however. When injured, she was close on to the end of of her career. Even prior to the accident, she had run in a claiming race at $19,000.[5] Despite this, Finney felt her true value at the time of the accident to be $25,000. It is notable that Barry, her part owner and trainer, valued her at only $10,000 more than Finney. Finney valued her at $10,000 as a brood mare after the accident.

(31) The value of Star Grad before the accident was $15,000. He was entered in a claiming race subsequent to the accident and claimed for $9500.

(32) The value of Prince Dion before the accident was $15,000. His value subsequent to the accident was $10,000.

### CONCLUSIONS OF LAW

(1) There is diversity of jurisdiction and the required jurisdictional amount in controversy is present.

(2) This Court has jurisdiction.

(3) Defendant's bus driver failed to keep a proper lookout.

(4) The speed of defendant's bus was greater than was reasonable or prudent under the conditions then prevailing, in violation of Title 21 Del.C. § 4125(a) and (b).

(5) This negligence was the negligence of the defendant.

(6) This negligence was a proximate cause of the accident.

(7) Defendant is liable to plaintiffs in damages.

(8) The Third Party Defendants are liable in damages to the defendant, Indian Trails.

(9) Damages should be awarded on the basis of the difference in fair market value of the property immediately before and immediately after the accident. Market price or value is the fair value as between one who is willing, but is not compelled, to sell and one who desires, but is not compelled, to buy. Weed v. Lyons Petroleum Co., 294 F. 725 (734) (D.C.Del.1923); aff'd 300 F. 1005 (C.A. 3, 1924); Magna Oil & Refining Co. v. White Star Refining Co., 280 F. 52 (59) (C.A. 3, 1922). Assuming no present day-by-day market such as a stock market, daily livestock quotation, or the like, there is no valid reason why a public auction value should not be accepted as a true market value. In fact, it can be argued that such a valuation is fairer than any other in an unusual type of case such as this. In any event, a number of cases hold that market value may be determined on the basis of value at public auction. Jackson v. Raisor, 248 S.W.2d 905, 907 (Ky.1952); Madisonville H. & E. R. Co. v. Ross, 126 Ky. 138, 103 S.W. 330, 331 (1897); Wallingford v. West. Union Tel. Co., 53 S.C. 410, 31 S.E. 275 (1898); Riegle v. State, 45 Ohio App. 251, 186 N.E. 875 (1933); McAdams v. Bolsinger, Ohio Prob., 129 N.E.2d 878 (1950); 31A C.J.S. Evidence § 181 at page 459.

### ADDITIONAL FINDINGS OF FACT

(33) Returning to the facts of this case, the witness, Finney, valued Gaelic Prince just before the accident at be-

---

4. While this statement was made in connection with Gaelic Prince's value as a stud horse, it accurately reflects Finney's judgment as to the horse's racing record and background as a whole.

5. Plaintiffs' witnesses admit this is tantamount to value.

tween $40,000 and $50,000. I adopt $50,000 as the fair valuation before the accident. Finney also valued Gaelic Prince as an injured, but still active, race horse with a bowed or "hot" tendon, in the sum of $5000 immediately after the accident. Plaintiff's witnesses claim Gaelic Prince had no value as a race horse and could only be sold as a riding horse or hunter in the range of from $500 to $2000, but it must be noted that at the same time plaintiff's witnesses testified Gaelic Prince had no value as a race horse after the accident, plaintiff, nevertheless, was still racing him as late as the mid-season of 1965; more than a year and a half after the accident. In fact, he seems to have disregarded the veterinary doctor's advice by racing him only two weeks after the accident. In any event, I accept Finney's testimony that while injured, probably permanently, and his value substantially impaired, he was still capable of racing at the smaller tracks against lower competition. In this connection, Finney's testimony is clearly supported by plaintiff's own veterinarian, Dr. Devine. I accept Finney's valuation of $5000 for Gaelic Prince immediately after the accident.

(34) As to Towson Gal, I accept Finney's valuation of $25,000 immediately before the accident. True, Barry testified she was worth $35,000 at the time, but in the light of the fact that Barry, her own trainer and part owner, had placed her in a claiming race for $19,000 in November of 1962, five months prior to the accident, his valuation of $35,000 is wholly unacceptable. Indeed, it is a mark of Mr. Finney's impartiality that, despite the entry of this horse in a $19,000 claiming race, he still valued her at $25,000. I also accept Finney's

valuation of Towson Gal at $10,000 as a brood mare just after the accident.

(35) The damages to Star Grad were $5500.

(36) The damages to Prince Dion were $5000.

(37) The damages to Towson Gal were $15,000.

(38) The damages to Gaelic Prince were $45,000.

The Court understands that any determination as to the apportionment of damages between defendant and Third Party Defendants shall be made subsequent to the filing of this opinion.

## MAINTENANCE AND MEDICAL EXPENSES [6]

Common sense and justice would seem to dictate that plaintiffs should have a reasonable period under the circumstances in which to treat and rest their horses in order to determine whether they had any future value as race horses.[7] However, there is a further question. Towson Gal, Prince Dion and Star Grad, after a certain period of rest, were raced regularly but, apparently, had to be treated medically at intervals as a condition precedent to keeping them in condition to race.

And as to Gaelic Prince, even a further question arises. He was permitted two weeks rest and medication and then raced without Dr. Devine's knowledge. Moreover, Dr. Devine (and also Dr. Mackey-Smith) were of the opinion that by so doing, the injury could well have been aggravated. But of unusual significance is the fact that after May 8, 1963, Gaelic Prince was not again raced until sometime in July, 1965, a year and a half later, and yet plaintiff still con-

---

6. What is said under this heading shall be treated as mixed findings of fact and conclusions of law.

7. Numerous cases have held that where animals have been injured, one of the

compensable elements of damages is the expense of keeping and feeding the animal during the period of diagnosis and convalescence. See Leavey v. Dennett, 45 A. 247 (N.H., 1898).

tends he is entitled to maintenance and medical bills.

 As to Towson Gal, Prince Dion and Star Grad, I am of the opinion that they are entitled to maintenance from April 26th to and through May 3rd, June 4th and June 8th, respectively, these being the dates when the particular horses started racing again on a regular basis. However, I am also of the view that medical treatment of injuries directly related to the accident (if any), necessary to keeping them in the best possible racing condition, should be allowable until the following dates —Towson Gal, July 17, 1963; Prince Dion, July 1, 1963; Star Grad, November 26, 1963, these being the dates of the last race for each horse while in plaintiffs' possession.

 As to Gaelic Prince, plaintiff, against good medical experience, raced him within two weeks. He makes the argument that he is entitled to maintenance and medical expenses even until the date of trial. This is unreasonable. By racing him on May 8th, he may well have aggravated the injury. By withdrawing him from further racing until mid-1965, he removed him from the type of consideration accorded the other three horses. In my view, the plaintiff is entitled to maintenance for Gaelic Prince until May 8, 1963, which, under the peculiar circumstances of his case, must be deemed a reasonable time for plaintiff to have made his election. And because he did not race him thereafter until mid-1965, plaintiff cannot be entitled to medical expenses for keeping him in racing beyond May 8, 1963.[8]

What is said under the heading of maintenance and medical expenses shall be deemed to represent findings of fact and conclusions of law.

---

8. Because unlike the other three horses, he was withheld from further racing for a wholly unreasonable period of time.